· · 328 P.2d 1083

TOTAH DRILLING COMPANY, a Corporation, Plaintiff-Appellee,

v.

Mike ABRAHAM, Defendant-Appellant.

No. 6371.

Supreme Court of New Mexico.

Aug. 14, 1958.

Keleher & McLeod, Albuquerque, for appellant.

Modrall, Seymour, Sperling, Roehl & Harris, Albuquerque, for appellee.

McGHEE, Justice.

On October 24, 1955, plaintiff, Totah Drilling Company, a New Mexico Corpo-ration, filed suit upon a promissory note for the sum of $27,367.04 which had been executed by the defendant, Mike Abraham, July 12, 1955, in Dallas, Texas, as con-sideration for drilling a well under an al-leged "turn-key" drilling contract, and for additional work thereon.

In the pleadings below defendant admit-ted the execution of the note but alleged in substance that the note was invalid for failure of consideration in that the plain-tiff did not properly complete the well ac-cording to the contract terms; that if the note was valid, defendant was entitled to an offset for charges and additional work properly includable under the terms of the contract; that defendant was entitled to damages for failure to perform the terms of the "turn-key" drilling contract; that plaintiff left "junk or tools" in the well; and that the note was procured by fraud and false representations.

The case was tried before the court with-out a jury and judgment was entered for the plaintiff for $26,502.65, the amount of the note less a credit of $864.39 for 2⅜ inch external upset tubing found by the trial court to have been removed from the well by the plaintiff at the request of the defendant. Plaintiff was also awarded 6% interest on the note plus 10% attor-ney's fees for the collection thereof.

The ultimate facts as found by the trial court are substantially as follows:

On March 10, 1955, plaintiff commenced drilling a gas well for the defendant on the NW¼ of Section 24 North, Range 5 West, NMPM, which well was designated as the J. J. Harris No. 2.

The site of this well was on land belonging to the Jicarilla Indians, leased to Magnolia Petroleum Company, "farmed out" to J. J. Harris and assigned by him to the defendant upon terms which required the drilling and completion of wells in a specified period in accordance with the requirements of Magnolia Petroleum Company. (Defendant was to finance the drilling of the wells and upon completion, Harris was to assign the wells to defendant.)

Acting on behalf of his assignee, the defendant, J. J. Harris entered into an agreement with the plaintiff for the drilling of the well in question for $23,250 on a "turnkey" basis, the essence of the contract, however, requiring compliance with the terms of the Magnolia farm out. Plaintiff drilled the same in compliance with the requirements of Magnolia Petroleum Company, the owner of the lease. The completed well was productive of gas but not in commercial quantities, and the defendant requested that the plaintiff perform additional work on the well in an effort to increase production but to no avail as to production.

Plaintiff drilled other wells for defendant which were commercial producers.

The well in question being duly and properly completed, Magnolia Petroleum Company assigned the specified acreage to J. J. Harris under the "farm out" agreement, who in turn assigned the same to defendant pursuant to the agreement between Harris and the defendant. However, defendant did not make payment of the costs of drilling to plaintiff and as a result plaintiff filed liens upon the leased property and on July 12, 1955, defendant settled the accrued and unpaid drilling obligations by delivery of $51,829.25 in cash and execution and delivery of his promissory note for the balance. Plaintiff then released its claim of lien.

At the request of defendant and in a further effort to make the J. J. Harris Well No. 2 a producer, plaintiff pulled certain 2⅜ inch tubing out of the well and replaced it with 1-inch pipe. Plaintiff was under no duty to salvage this pipe but did so and agreed to credit the note by the sum of $864.39.

Defendant failed to pay the note in accordance with the terms thereof and this suit followed. From judgment below, defendant prosecutes this appeal. The specific grounds relied on for reversal will appear in the opinion as each contention is discussed.

Plaintiff-appellee correctly points out that defendant-appellant has throughout his brief in chief, with three excep-

tions, violated Supreme Court Rule 15, subd. 6 in that he relies upon facts contrary to those found by the trial court, fails to state the substance of all the evidence in the record bearing upon his contentions, and makes reference primarily only to evidence favorable to the defendant. This rule has been construed many times and it is now settled that the findings of fact made by the trial court are the findings upon which the case must rest. This court will not search the record in an effort to find facts with which to overturn the findings made by the lower court. Gore v. Cone, 60 N.M. 29, 287 P.2d 229, and cases cited therein; Cross v. Ritch, 61 N.M. 175, 297 P.2d 319, and cases cited therein. In reviewing the evidence on appeal, all disputed facts are resolved in favor of the successful party and all reasonable inferences indulged in to support the judgment. All evidence and inferences to the contrary will be disregarded and the evidence viewed in the aspect most favorable to the judgment. State ex rel. Magee v. Williams, 57 N.M. 588, 261 P.2d 131; Rasmussen v. Martin, 60 N.M. 180, 289 P.2d 327. And if the findings thus found are supported by substantial evidence they will be sustained on appeal. State ex rel. Magee v. Williams, supra.

Thus, as to points argued in violation of Supreme Court Rule 15, subd. 6 only summary consideration has been given to the facts construed in the light most favorable to plaintiff-appellee.

The sole direct attack made by defendant on the trial court findings is Point VI that the court erred in finding J. J. Harris to be an agent of defendant. Defendant predicates his argument on the theory that because J. J. Harris was paid by the plaintiff out of the turn-key consideration to be paid by the defendant to the plaintiff for drilling the well in question, there was created such a conflict of loyalty that Harris could not be the agent of defendant. Neither plaintiff nor defendant has favored us with any authority for or against this proposition, however, after careful consideration, we find there is no merit in defendant's contention.

As we view the record there is substantial evidence to support the trial court finding that Harris on behalf of the defendant entered into an oral agreement with the plaintiff subsequently reduced to writing embodying specifications worked out by Harris and the defendant and discussed by Harris with the plaintiff. In addition to being designated the owner-operator under the Magnolia lease, it is evident that Harris was recognized by all parties as the geologist in charge of the drilling and fracking of the well. Plaintiff's witnesses testified Harris was considered the representative of the owner or

as working on behalf of himself and the defendant as joint owners of the lease farm out and that it was Harris and Abraham who ordered the bringing in of a gas completion rig to do additional work on the well to make it a producer; and that Harris was in charge of additional drilling and other work after completion of the well.

It is noted, too, that defendant remained in Dallas all the time the well was being drilled. Unless Harris was acting for defendant, who could be said to be looking after his interest where there was ample testimony that his brother, Oscar Abraham, had no authority to bind defendant and that it was a custom in the industry for the owner or his representative to be present for making decisions with reference to the well? See, 1 Mechem, Law of Agency, § 300 (2d ed. 1914).

■ The fact that plaintiff paid his salary, though a fact to be considered in an agency relationship, is not conclusive that such interest will be adverse to that of the defendant, especially here, since the salary was to be paid out of the turn-key consideration paid by defendant, the salary was set and agreed to by both plaintiff and defendant. When Harris asked for a raise, the amount was agreed upon in the presence of the defendant and added to the turn-key consideration with his consent. In fact, there is a stronger argument that plaintiff was the agent of the defendant to pay Harris.

■ Furthermore, if it can be said that the position of Harris in getting the salary from the plaintiff, acting as geologist on the well for his own benefit and for that of the defendant created such a conflict of loyalty that he could not be said to be acting primarily for the benefit of the defendant and therefore could not be his agent, the defendant is estopped to so assert since he consented to this arrangement and actively participated in it by conveying or allowing to be conveyed the impression that Harris was his agent in matters concerning the well. Restatement, Agency, § 13, comment a, (1933); 1 Mechem, Law of Agency, §§ 177, 178 (2d ed. 1914).

Had Abraham desired Harris to be other than agent he should have so stated to the plaintiff; the record is, however, silent on this point and the statements of plaintiff's witnesses that his manifestations were such that they believed Harris to be the representative of Abraham and other testimony create a reasonable inference that Abraham so recognized Harris until their dispute which occurred after the well was drilled.

■ It is not necessary that the parties intend to create the legal relationship of agency or to subject themselves to the liabilities which the law imposes upon them as a result of it, but only that the principal has in some manner indicated that the agent is to act for him, and that the agent

so acts or agrees to act on his behalf and subject to his control. Restatement, Agency § 1 (1933); 1 Mechem, Law of Agency, § 252 (2d ed. 1914). It is manifest from the evidence that the fiduciary relationship between Harris and defendant subjected Harris to the control of defendant rather than plaintiff. The trial court did not err in finding Harris to be the agent of the defendant.

Under Point I defendant asserts that plaintiff failed to perform the contract according to its terms and therefore the plaintiff was not entitled to recover from the defendant. The contract as reduced to writing reads as follows:

"Mr. Mike Abraham

814 Mercantile Bank Bldg.,

Dallas 1, Texas

"Dear Mike:

"This letter will serve to confirm our verbal agreement for the drilling of eleven Pictured Cliffs Wells on your acreage located in T 24 N—R 5 W, Rio Arriba County, New Mexico, generally identified as the Harris lease.

"Our company proposes to drill these wells on a *turn-key basis in which we intend to furnsh specifically the following items*:

"1. Making of roads and location.

"2. Setting 100′ 9⅝″ surface casing.

"3. Drilling 8¾″ hole *to Pictured Cliffs formation at a maximum depth of 2300′.*

"4. Furnishing and running 5½″ 14# casing *to top of Pictured Cliffs.*

"5. *Completion with cable tool rig through the producing formation.*

"6. Fracking well with a maximum of 10,000 gallons #2 diesel oil plus 2,500 gallons flush 8,000 pounds sand, use of four Halliburton pumpers (actually eight injection pumps).

"7. Cleaning out well, furnishing and connecting well head of capacity to handle 6,000 MCF wells, and 2⅜″ external upset tubing.

"8. Cleaning up location.

"It is our proposal to drill these wells on a *turn-key basis* for a price of $23,250.00 each, plus New Mexico school tax as assessed. *This price should include all costs that may be incurred in the successful completion of these wells within the specific limitations of maximum depth and fracture procedure* as outlined above. The cost includes all expenses as incurred on the Harris No. 1, with the exception of extra electric logs, and it is our intention that unless some extra work

or materials are specifically required that no additional billing will be required.

\* \* \* \* \* \*

"Very truly yours,

"Totah Drilling Company"

(Emphasis supplied.)

Six reasons are set forth as to why the well allegedly was not a completed well according to the terms of the contract. First, that the pipe was not placed on top of Pictured Cliffs formation; second, that plaintiff was under a duty to place a liner in the well when it started caving; third, that plaintiff failed to put heavy-duty heads and fittings on the well as called for by the contract; fourth, that plaintiff removed the 2⅜ inch pipe that had been placed in the well; fifth, that the well was never properly fracked; sixth, that the well was left in a caved-in condition.

In support of the first proposition defendant relies on the testimony of R. E. Jackson, co-owner of plaintiff corporation, to the effect that the pipe was set ten feet above the Pictured Cliffs formation whereas the contract provided for drilling an 8¾ inch hole to Pictured Cliffs formation at a maximum depth of 2300 feet and running of 5½ inch 14# casing to top of Pictured Cliffs. This same witness testified also that the depth to which they drilled was designated by J. J. Harris and that he told them when to set the pipe and further,

that in their operations ten feet above the pay was considered the top. J. J. Harris testified that he designated the point for setting the casing and that he was satisfied that he picked the top of Pictured Cliffs formation. Although other testimony is conflicting as to whether the pipe was set on top of the formation or ten feet above and whether setting it ten feet above would be compliance with a contract calling for it to be set on top, any non-compliance with this term must rest on the defendant as there is substantial evidence to support a finding that J. J. Harris in directing the setting point was acting on behalf of the defendant and himself. Where the driller can show that the owner instructed him to drill to a lesser depth than the contract depth he is entitled to recover on the contract, assuming compliance with other terms thereof. 2 Thornton, Oil and Gas, § 703 (rev. ed. 1932).

Defendant in support of his second proposition makes the bare assertion that it was the duty of the plaintiff to "at least try a liner in the well under the meaning of a 'turn-key' contract" to prevent or to stop the caving in and that if a liner had been placed in the hole by plaintiff, then it could have been determined by all parties whether or not this was a dry hole, or whether the cave-ins were stopping the gas, if any, from flowing. After diligent research we are at a loss to see what materiality a "turn-key" contract has to the

duty to place a liner in the well unless that duty is imposed by the terms of the agreement or a modification thereof. See 7 Summers, Oil and Gas, § 1493, Drilling Contract, Mississippi Form (a turnkey contract which makes specific mention of using liners upon completion), (perm. ed. 1938).

■ On the other hand the contract is silent on this point and further the testimony is conflicting as to whether there was ever an oral agreement to use a liner, whether a liner would have done any good, whether the well was caving before or after the first frack job, and whether there was a custom in the industry to impose such duty on the driller. Since there is evidence supporting the finding of the trial court and in the absence of a provision in the contract calling for a liner, the defendant's contention is without merit.

■ Defendant next asserts that plaintiff was required and failed to use a heavy duty wellhead and fittings on the well and that plaintiff removed the 2⅜ inch pipe required by the contract to be placed in the well. As to the former the only requirement stipulated in the contract was that the wellhead be of capacity to handle 6,000 MCF wells. The evidence is conflicting as to whether the head on Harris No. 2 was of sufficient capacity, but in the absence of clearer proof of the kind intended by the parties and the kind actually

put on the well, this court will not overturn the action of the trial court. As to the latter, it is sufficient to say that defendant has not been injured as he has received a credit for such pipe, and furthermore, there is evidence to support the trial court finding that the pipe was removed at defendant's request so 1-inch pipe might be inserted in an effort to make the well a producer.

■ As to the defendant's next contention that the well was not properly fracked, the record and defendant's brief indicate that defendant proceeded on the theory that "fracking" means to break down the formation, whereas, plaintiff and its witnesses consistently used the term with reference to "an attempt to break down the formation by use of a specific method of penetrating it with some substance at high pressures" thereby causing or making it possible for the gas to flow if there was any in the producing formation. We believe the latter is correct usage of the term within the meaning of the contract.

■ Thus, the evidence amply supports the conclusion that the well was properly fracked according to the terms of the contract on March 26, 1955, although the formation did not break down. The contract does not call for a "successful" fracking but only fracking in a specified manner with specified materials, that is, the forma-

tion was to be subjected to a fracking procedure using a maximum quantity of oil and sand rather than a minimum, thereby reserving to the plaintiff some discretion as to the quantity used and the pressures applied. R. E. Jackson explained the reason for such a contract provision:

"Witness: * * * If I had said I was going to guarantee to put exactly 10,000 gallons into the well that contract would have been a minimum and I would probably have had to have had 15,000 gallons of diesel fuel on there for lossage. Your operator could have come back and said that you didn't have it to put. That contract is the same way. * * *

* * * * * *

"A. There is a hundred things that might be able to happen. The formation won't break down properly; you might not be able to get it in there— I wouldn't make any contract where I would guarantee I would keep *fracing* a well and spend four or five thousand every time I tried to *frac* it."

The invoices from the contractor who did the fracking, as well as testimony of several witnesses indicate substantial compliance with this provision of the contract, the only possible deviation being the exercise of plaintiff's judgment to discontinue the first frack attempt after some 2,700 to 2,800 pounds of pressure for fear of breaking the casing which had a tested tensile strength of 3,000 pounds, but it is noted that Harris participated in this decision. There is, therefore, no merit in defendant's contention that the well was not properly fracked.

As to defendant's contention that the well was left in a caved in condition, defendant makes a general reference to the record testimony of R. E. Jackson to support this allegation. We believe this testimony must be accepted with reference to the completion date of the well, which we define below. He stated in part on cross examination:

"Q. Would you say that leaving a caved-in hole after *frac* would be finishing the job in a workmanlike manner? A. I certainly would in this case, Mr. McLeod. How long do you think we should continue to clean a hole out if it is not making any gas. You can't go from now on.

"Q. You didn't go in without charging for it? A. It was cleaned out then, and the additional work that was done was what we charged for.

"Q. The contract called for you to clean it out? A. *We did clean it out after completion.*" (Emphasis supplied).

Although the overall testimony is conflicting as to whether the well started caving in prior to the first frack job or sub-

sequent thereto, there is substantial testimony that the well was cleaned out just prior to the first frack and that plaintiff returned to the well and cleaned it out to TD, that is, to 2,290 feet, again, and that several more attempts to clean out the well were made both by the plaintiff and later by V. L. Wheeler who worked on the well at the request of the defendant some six or eight months after the plaintiff had finished its work on the well. Nevertheless the well kept caving in and the testimony creates some doubt whether any of these clean out jobs did or would have done any good.

The issue as we see it is whether or not the plaintiff was under a duty to clean out the well after the first frack and not charge for it in the event the formation did not break down under fracking and to perform additional work without additional charge to make the well a producer.

The testimony and actions of plaintiff appear to rest on the theory that the well was a completed well March 26, 1955, the day of fracking, since it did not produce gas in commercial quantities. Plaintiff contends that it would have plugged this well as a dry hole and abandoned it as required by the Magnolia farm out but for the acts of the defendant in requesting additional work to be done on it. The theory of defendant is that the well was never a completed well within the meaning of the contract because of certain alleged acts and omissions of plaintiff, above stated.

Since the trial court found that the essence of this drilling contract required completion of the wells in accordance with the terms of the Magnolia farm out agreement, and this finding was not attacked, the two instruments must be construed together. The farm out agreement provided in part for commencement of the wells within a specified time, drilling with due diligence to a depth sufficient to test to Magnolia's complete satisfaction the Pictured Cliffs formation, at an estimated depth of 2,500 feet, unless gas be produced in paying quantities at a lesser depth. The completion date as to a non-producing well was to be the date upon which the plugging operation was completed, provided a representative of Magnolia was notified before any well was plugged or abandoned.

"The question of what is meant by 'completion of a well' in a lease, option, or drilling contract is one of construction by the court to ascertain the intent of the parties * * *."

Kulp, Oil and Gas Rights, § 10.35 (1954).

It is, however, settled that the completion of a well requires something more than just drilling in. At the least it means the cleaning out of the well after reaching a specified depth, which was done here. 2 Thornton, Oil and Gas, § 697 (rev. ed. 1932,

Supp.1956); or the shooting of the well if there is doubt as to whether it is a producer or non-producer. Uncle Sam Oil Co. v. Richards, 76 Okl. 277, 184 P. 575, cited in numerous text authorities. Either theory is certainly consistent with the position taken by appellee, since fracking a well is aimed at the same goal that "shooting" a well is. Where the depth is not specified something more is required, Howard v. Hughes, 1940, 294 Mich. 533, 293 N.W. 740, but here the depth was specified. Ultimately, whether oil or gas has been found in paying quantities is determined by the good faith and honest judgment of the operator. Griffith v. Johnson, Tex.Civ.App., 283 S.W. 608.

In view of the provisions of the lease and the above statements of law we believe the relevant contract provisions should be construed as follows:

The words "completion with cable tool rig through the producing formation" plainly and unambiguously mean completion of the hole to the depth specified by the contract or by order of the owner in preparation for fracking or some other method of stimulating the flow of gas in the event the well does not voluntarily produce. In other words, this clause as construed with the farm out simply requires the driller to drill with due diligence to completion of the hole as distinguished from completion of the well. See 2 Summers, Oil and Gas, § 350 (perm. ed. 1938).

The phrase in the last clause of the contract, "successful completion of these wells within the specified limitations of maximum depth and fracture procedure as outlined above," is also clear and unambiguous. Although a producer was contemplated, it was not guaranteed, as also is apparent from the terms of the lease; rather, if, after complying with the specified limitations and requirements set forth in the contract, a dry hole was encountered, appellee was under no duty to attempt to make it a producer unless a new contract was entered or the defendant agreed to pay for the additional work involved. See 4 Summers, Oil and Gas, § 687 (perm. ed. 1938); 2 Thornton, Oil and Gas, § 723 (rev. ed. 1932).

We believe clause No. 7 calling for the cleaning out of the well clearly imposes a duty on plaintiff to clean out the well after fracking if the well is a producer, or in the view of a reasonably prudent operator could be made a producer, so that the other equipment could be of practical value.

Absent an express provision to the contrary, we believe there is a duty imposed even though the well likely will not be a producer if the owner manifests a desire to continue work on such well; however, the evidence here was conflicting whether a charge was made so the action of the trial court will be sustained.

■ In view of the above statements of law and in the absence of a showing of bad

faith on the part of the operator we hold this was a completed well when it was cleaned out after the first frack job and that there was then no duty on the plaintiff to keep cleaning out the well without charge ad infinitum.

Finally, under this point, defendant urges this was a "turn-key" job which required the production of "oil into the tanks." In support of this contention, he cites a definition commonly given to such term:

"A 'turnkey contract' in the oil industry means that the driller undertakes to furnish everything and to do all the work required to complete a well, place it on production and turn it over ready to start the oil running into the tanks." 2 Thornton, Oil and Gas, § 704. Completed Well (rev. ed. 1932, Supp. 1956), citing Continental Oil Co. v. Jones, 10 Cir., 177 F.2d 508.

See, also, 2 Thornton, Oil and Gas, § 697. Drilling contracts; duty of lessee to drill wells, citing White v. Cascade Oil Co., 14 Cal.App.2d 695, 58 P.2d 994; Retsal Drilling Co. v. Com'r of Internal Revenue, 5 Cir., 127 F.2d 355; Kulp, Oil and Gas Rights, § 10.105. Rights and Obligations Under Drilling Contracts (1954); 4 Summers, Oil and Gas, § 682. Construction (perm. ed. 1938, Supp.1957).

It is to be noted, however, that the cases cited by the appellant do not really support his position and that none of the authorities have discussed the significance or meaning of a turn-key contract, but have simply cited the cases upon which the appellant relies.

We believe the better view is that a turn-key job means the testing of the formation contemplated by the parties and completion of a producing well or abandonment as a dry hole all done for a specific agreed-upon total consideration thereby putting the risk of rising costs, costs of well trouble, delays caused by the weather, etc., upon the contracting driller. In the absence of a clear expression in the contract the driller should not be held to guarantee a producing well. 4 Summers, Oil and Gas, § 687 (perm. ed. 1938).

Defendant's second point is that the note was invalid and voidable for failure of consideration and by reason of the plaintiff's false representations and statements made to defendant, and for the reason plaintiff had included in the amount of the note charges for so-called extra work which should have come under the contract.

As seen, there was not failure of consideration and the terms of the contract were substantially complied with before any additional work was done or extra charges made.

Defendant has also asserted that the argument made under Point I is applicable here without setting forth the matter under the point argued in violation of the settled

394

rule that objections to a finding, together with the substance of the evidence touching it, must be set out under the point in which it is attacked or it will not be considered. Hugh K. Gale, Post No. 2182 Veterans of Foreign Wars, of Farmington v. Norris, 53 N.M. 58, 201 P.2d 777.

As to the assertion of false representations inducing the signing of the note, it is sufficient to note that the trial court found otherwise by denying defendant's requested conclusions of law, and further that although defendant points out that "Wiedemer admits that he could have told the Defendant that Well No. 2 was as good, or a better well than Well No. 1" he neglects to point out his testimony to the effect that he absolutely did not make such statement, but may have said the well was producing a little gas.

■ No citation of authorities is necessary to show that the mere possibility of having made a statement or representation is not sufficient to support a defense of fraud or false representation. The statement must have *actually* been made with intent to induce action taken in reliance thereon. The trial court did not err in denying defendant's requested conclusion of law on this point.

We have considered other arguments made under this point to the effect that if the note is invalid in any part, plaintiff is not entitled to interest and attorney's fees and have concluded in view of what has been said they are without merit. It is noted that this same argument was made under Point IV in violation of the holding of Hugh K. Gale case, supra, as above stated, and therefore further consideration is unnecessary for this reason also.

■ Point III alleges that defendant is entitled to some $13,000 as an offset for extra charges for certain work properly includable under the terms of the turn-key contract. In view of what has been said this point is without merit.

■ Defendant's contention in Point V that plaintiff left "junk or tools" in the hole and therefore the well was not a completed well (as argued under Point I) and that defendant is entitled to recover the necessary cost to clean out the hole (as argued under this point) is likewise without merit. A careful examination of the record supports the conclusion that when plaintiff left the well there was no junk in the hole and that if junk was found in the hole it was six or eight months after the plaintiff had finished its work on the well and while other people employed by the defendant had worked there. If there is evidence supporting the trial court action, it will not be reversed.

■ As the evidence was extremely conflicting in some aspects, plaintiff's request for punitive damages for dilatory

tactics in prosecuting this appeal will be denied.

In view of what has been said the judgment of the lower court for the plaintiff will be affirmed, and It Is So Ordered.

LUJAN, C. J., and SADLER, COMPTON and SHILLINGLAW, JJ., concur.