596 P.2d 260

**NEW MEXICO LIFE INSURANCE GUARANTY ASSOCIATION, Plaintiff-Appellant,**

v.

**Kenneth C. MOORE, Superintendent of Insurance of the State of New Mexico, New Mexico Blue Cross-Blue Shield, Inc., Lovelace-Bataan Health Program, and New Mexico Health Care Corporation, Defendants-Appellees.**

**No. 12138.**

Supreme Court of New Mexico.

June 11, 1979.

Rodey, Dickason, Sloan, Akin & Robb, Victor R. Marshall, William C. Briggs, Albuquerque, for plaintiff-appellant.

Robert W. Botts, Thomas A. Levin, Sutin, Thayer & Browne, Ronald Segel, Albuquerque, for defendants-appellees.

OPINION

SOSA, Chief Justice.

The issue presented in this appeal is whether defendant health plans are engaged in "health insurance" so as to subject them to New Mexico's Life Insurance Guaranty Act (hereinafter referred to interchangeably as Guaranty Act and Act).

The New Mexico Life Insurance Guaranty Association (hereinafter referred to as Association) brought suit in the District Court of Santa Fe County seeking a judgment declaring defendants subject to the Guaranty Act. Defendants denied that they were subject to the Act. The case was tried on the stipulated record.

The district court concluded that defendants did not write any kind of "insurance" to which the Guaranty Act applies, that defendants were not "member insurers" within the meaning of the Act, and that defendants were, therefore, not liable

for any assessments levied by the Association. The Association appeals. We affirm.

The Association is organized pursuant to the Guaranty Act, §§ 59–22–1 to 17, N.M. S.A. 1978. Section 59–22–2 states that the purpose of the Act is to

provide a mechanism to facilitate the continuation of coverage, the payment of covered claims under certain insurance policies, to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer, to assist in the detection and prevention of insurer insolvencies and to provide an association to assess the cost of such protection among insurers.

Section 59–22–3 provides that the Guaranty Act applies to

all direct life insurance policies, health insurance policies, annuity contracts and contracts supplemental to life and health insurance policies and annuity contracts. It also applies to reinsurance of such contracts which does not provide for liability without diminution because of the insolvency of the ceding company.

All insurers are required to be members of the Association as a condition of their authority to transact insurance business covered by the Act. § 59–22–5. Section 59–22–4(G) defines a "member insurer" as any person who

(1) writes any kind of insurance to which the Life Insurance Guaranty Act applies; and

(2) is licensed to transact insurance in this state[.]

When a "member insurer" becomes insolvent, the Association guarantees or reinsures all the covered policies of the insolvent insurer and provides money, notes, guarantees or other means to assure payment of the contractual obligations of the insolvent insurer. § 59–22–7.

Defendants are nonprofit health care plans organized and operating under the Nonprofit Health Care Plan Act, §§ 59–19–1 to 48, N.M.S.A. 1978. The purpose of this Act is to

provide for the reasonable regulation of membership corporations organized for the purpose of making health care expense payments on a service benefit basis or on an indemnity benefit basis, or both, for persons who become subscribers under contracts with such corporations.

§ 59–19–2. Section 59–19–3(K) defines a "health care plan" as

a nonprofit corporation which is authorized by the superintendent of insurance to enter into contracts with subscribers and to make health care expense payments; all health care plans shall be governed by the provision of this act regulating nonprofit health care plans[.]

The question we address in this appeal is whether defendants are engaged in the "kind of insurance to which the . . . Guaranty Act applies." The difficulty in answering this question arises because the Act does not define the terms "insurance" or "health insurance." This is a case of first impression in New Mexico.

The New Mexico Legislature enacted the original nonprofit hospital service plan enabling legislation in 1939. *See* N.M. Laws 1939, ch. 66, § 1 (601) to (611). This legislation provided a mechanism for a nonprofit health care plan to exist and operate.

Subsequently, Hospital Service, Inc., was incorporated by the Board of Directors of what was then the Presbyterian Hospital. The purpose of Hospital Service was to

furnish hospital care to Subscribers or such of the public as shall become Subscribers; to provide for such hospitalization in hospitals or hospital with which this Corporation has a contract; to operate as a nonprofit corporation in order to secure hospital protection at a minimum cost to its Subscribers . . .

Concurrent with the development of Hospital Service, the New Mexico Medical Society developed a physician prepayment plan known as the New Mexico Physicians Service. The plan existed independently of any enabling legislation. The New Mexico Legislature enacted the Physicians Service Plans Act in 1947. *See* N.M. Laws 1947, ch. 157, § 1. Surgical Service, Inc. was formed in October 1947. Its purpose was to

establish, maintain, and operate a voluntary, nonprofit medical-surgical plan . . . whereby the services of any Doctor of Medicine are provided, at the expense of the Corporation, in the manner specified in the contract with Subscribers. Such medical and surgical care, may be provided in their entirety or in part as the Corporation may determine and as set out and as set forth in such contracts.

In 1960, Surgical Service became an approved Blue Shield Plan and began using the Blue Shield symbol. It contracted with doctors to accept payment from Surgical Service as payment in full for covered services.

The New Mexico Legislature enacted the Nonprofit Health Care Plan Act in 1963. *See* N.M. Laws 1963, ch. 288, § 1. On July 1, 1972, Hospital Service and Surgical Service merged into New Mexico Blue Cross & Blue Shield, Inc. (hereinafter referred to as Blue Cross). Blue Cross assumed all the obligations and assets of Hospital Service and Surgical Service.

Lovelace-Bataan Health Program (LBHP) is organized and functioning as a health maintenance organization (HMO). As an HMO, LBHP represents an alternative health care system which has developed in response to public concern about rising health care costs and lack of access by many people to high quality health care services. *See Huff v. St. Joseph's Mercy Hosp. of Dubuque Corp.*, 261 N.W.2d 695 (Iowa 1978). An HMO is distinguished from the "classic health care insurance system under which the patient chooses his own physician and other health care facilities." *Ludlam, Health Maintenance Organizations HMOS: Do They Really Work?*, 10 Forum 405, 406 (1974). Defendants assert that HMOs do not provide indemnity or security for loss or damage, but rather a convenient method of prepayment for health care services, with emphasis on preventive care. Members of LBHP are entitled to receive health care services upon the periodic payment of a fixed amount specified at the beginning of the term of LBHP Service Agreements.

New Mexico Health Care Corporation (Mastercare) is also organized and functioning as an HMO. It has entered into agreements with approximately 300 physicians and psychologists in the Albuquerque area, by which their services are made available to persons who are eligible to receive health care services.

Both LBHP and Mastercare pay medical providers directly for their services. Neither reimburses or indemnifies its members for the costs of such services, except to the extent that members have been required to pay non-participating providers directly for covered services performed by physicians and psychologists.

We note that Blue Cross has approximately 200,000 members who are eligible for various benefits. LBHP has approximately 2,700 members, while Mastercare has approximately 19,600 members who are eligible to receive health care services through their respective programs.

Insurance usually involves a contract whereby the insurer, for an adequate consideration, undertakes to indemnify the insured against loss arising from specified perils, or to reimburse him for all or part of an obligation he has incurred. *Barkin v. Board of Optometry,* 269 Cal.App.2d 714, 75 Cal.Rptr. 337 (1969). *See also* 43 Am.Jur.2d *Insurance* § 1 (1969).

Webster's Third New International Dictionary of the English Language 1173 (unabr. ed. 1976) defines "insurance" as:

the action or process of insuring or the state of being insured usu. against loss or damage by a contingent event (as death, fire, accident or sickness) . . . coverage by contract whereby for a stipulated consideration one party undertakes to indemnify or guarantee another against loss by a specified contingency or peril . . . .

The United States Supreme Court has recently stated that "[t]he primary elements of an insurance contract are the spreading and underwriting of a policyholder's risk." *Group Life & Health Insurance Co. v. Royal Drug Co.,* 440 U.S. 205, 211 99 S.Ct. 1067, 1073, 59 L.Ed.2d 261 (1979).

■ Generally, a nonprofit corporation which provides members of a group with medical services and hospitalization is considered not engaged in insurance and thus not subject to insurance laws. *See* 43 Am. Jur.2d *Insurance* § 11 (1969). In *Hospital Service Corp. of R. I. v. Pennsylvania Ins. Co.,* 101 R.I. 708, 227 A.2d 105 (1967), the Rhode Island Supreme Court upheld as valid a provision in a hospitalization policy that the company would be subrogated and succeed to the subscriber's right to recover. The court stated its opinion that Blue Cross "is not engaged in the insurance business and is therefore not an 'insurer.'" *Id.* at 111. Indeed, Blue Cross and Blue Shield organizations have historically taken the position that they are not insurance companies. *See* Denenberg, *The Legal Definitions of Insurance,* 30 J.Ins. 319 (1963).

In *Group Life, supra,* the Supreme Court cited *Jordan v. Group Health Ass'n,* 71 U.S. App.D.C. 38, 107 F.2d 239 (1939), as "illustrative of the contemporary view of health care plans." 440 U.S. at 227, 99 S.Ct. at 1081. Like defendants in the case at bar, Group Health was a nonprofit corporation organized to provide members who had paid a fixed annual premium with various medical services and supplies. Group Health contracted with physicians and hospitals to provide those services. The D.C. Court of Appeals held that Group Health was not engaged in the business of insurance. The court stated:

Although Group Health's activities may be considered in one aspect as creating security against loss from illness or accident, more truly they constitute the quantity purchase of well-rounded, continuous medical service by its members. Group Health is in fact and in function a consumer cooperative. The functions of such an organization are not identical with those of insurance or indemnity companies. The latter are concerned primarily, if not exclusively, with risk . . . . On the other hand, the cooperative is concerned principally with *getting service rendered* to its members and doing so at lower prices mad^ possible by quantity

purchasing and economies in operation. Its primary purpose is to reduce the cost rather than the risk of medical care; to broaden the service to the individual in kind and quantity; to enlarge the number receiving it; * * *. (Footnotes omitted.)

71 U.S.App.D.C. at 46, 107 F.2d at 247.

In *California Physicians' Service v. Garrison*, 28 Cal.2d 790, 172 P.2d 4 (1946), California Physicians' Service sought a declaratory judgment that it was not engaged in the business of insurance within the meaning of California's regulatory statutes. The Insurance Commissioner appealed from judgment for plaintiff. The California Supreme Court affirmed the trial court's judgment that Physicians' Service was not engaged in the business of insurance. The court stated:

> There is another and more compelling reason for holding that the Service is not engaged in the insurance business. Absence or presence of assumption of risk or peril is not the sole test to be applied in determining its status. The question, more broadly, is whether, looking at the plan of operation as a whole, "service" rather than "indemnity" is its principal object and purpose. [Citations omitted.] Certainly the objects and purposes of the corporation organized and maintained by the California physicians have a wide scope in the field of social service. Probably there is no more impelling need than that of adequate medical care on a voluntary, low-cost basis for persons of small income. The medical profession unitedly is endeavoring to meet that need. Unquestionably this is "service" of a high order and not "indemnity."

172 P.2d at 16.

None of the parties were able to cite a case on point, and we were unable to find any such case in our research. However, we find the reasoning of the courts in *Jordan, supra,* and *California Physicians' Service, supra,* persuasive.

The Association asserts that because defendant health plans are subject to the Insurance Company Insolvency Act, §§ 59–6– 31 to 35, N.M.S.A. 1978 and the Unfair Insurance Practices Act, §§ 59–11–9 to 22, N.M.S.A. 1978, it follows that they are also subject to the Guaranty Act. Section 59–6– 32 provides that an insurance company includes "mutual nonprofit hospital service corporations" and "nonprofit medical service corporations." Section 59–11–11 states that "[f]or purposes of the Unfair Insurance Practices Act, health care plans shall be deemed to be engaged in the business of insurance[.]" We note that there is no specific mention in the Guaranty Act of nonprofit medical or hospital service corporations. Rather, the Legislature has elected to apply the Act only to "insurers" and "health insurance policies." We find that legislation impacting on health care plans requires specific reference to health plans or amendment of the Guaranty Act and Nonprofit Health Care Plan Act.

We conclude that defendants are not "member insurers" within the meaning of the Guaranty Act and that they are not engaged in "any kind of insurance" to which the Act applies. *See* 53 Yale L.J. 162 (1943). Our conclusion is based on the fact that defendant health plans are service benefit organizations, as distinguished from the indemnity benefit nature of commercial insurers.

McMANUS, Senior Justice, and EASLEY, J., concur.