671 P.2d 31

**In the Matter of the REHABILITATION OF WESTERN INVESTORS LIFE INSURANCE COMPANY:**

**WESTERN INVESTORS LIFE INSURANCE CO., by Receiver, Plaintiff-Appellee,**

v.

**NEW MEXICO LIFE INSURANCE GUARANTY ASSOCIATION, Defendant-Appellant.**

No. 14504.

Supreme Court of New Mexico.

Oct. 17, 1983.

Victor R. Marshall, Robert A. Johnson, Rodey, Dickason, Sloan, Akin & Robb, Albuquerque, for defendant-appellant.

Marshall G. Martin, Jason W. Kent, Poole, Tinnin & Martin, Albuquerque, for plaintiff-appellee.

## OPINION

STOWERS, Justice.

This appeal arises from the liquidations of two defunct New Mexico insurance companies and involves the construction and application of the New Mexico Life Insurance Guaranty Act (the Act), NMSA 1978, Sections 59–22–1 through 59–22–17. Central to this decision is the exclusionary provision found in Section 59–22–13(F) which provides that:

> The Life Insurance Guaranty Act shall not apply to any insurer which is insolvent or unable to fulfill its contractual obligations on the effective date of the act.

The Act became effective April 9, 1975. The appellee, the insurance superintendent, in his capacity as receiver for the Western Investors Life Insurance Company (Western Investors) sued the New Mexico Life Insurance Guaranty Association (the Association), the appellants, for a determination that the Act covered the policies of Western Investors, including those originally issued by the Western American Life Insurance Company (Western American). The district court decided in favor of the receiver and the Association appeals. We reverse.

The issues on appeal are: (1) whether Western American was able to fulfill its policy obligations on April 9, 1975; and (2) whether Western Investors was able to fulfill its policy obligations on April 9, 1975.

The facts and history of this case are as follows. The Act is patterned after a model act proposed by the National Association of Insurance Commissioners. Section 59–22–5 establishes a guaranty association to which all insurers doing business in New Mexico must belong. Should any member insurer be declared insolvent or found to be potentially unable to fulfill its contractual obligations, Section 59–22–7 provides that the Association will ensure that policyholders of the insolvent or financially disabled company receive their policy benefits. The Act defines "contractual obligation" as any obligation under an insurance policy covered by the Act. § 59–22–4(D) and (E). Pursuant to Section 59–22–8, the Association is empowered to assess the member insurers to raise the funds necessary to cover the policy obligations of the insolvent or disabled insurer.

Section 59–22–13(F), which excludes from the Act's coverage any insurer that was "insolvent or unable to fulfill its contractual obligations on the effective date of the act" (April 9, 1975), is a provision not found in the model act. The record shows that the legislative intent was to prevent insolvent companies and companies unable to fulfill their contractual obligations from obtaining the benefits provided by the Act. At trial, the draftsman of this statute was

asked to relate the intent with which Section 59–22–13(F) was drafted and later adopted by the Legislature. He stated that:

> (By witness Mr. Briggs) The Western American had not been adjudicated as insolvent at the time the amendment was prepared, yet it was certainly my feeling that it could not meet its contractual obligations, its policy obligations. Therefore, we added that specifically to take the case of Western American and any other companies if there were such that were unable to meet their obligations, but not judicially declared insolvent.

Western American was placed in receivership and declared insolvent on May 15, 1975. The then superintendent of the Department of Insurance sought coverage for Western American policies but the Association refused to provide coverage based on the Act's exclusionary provision. The superintendent then arranged for Western Investors to assume the assets and policy obligations of Western American. On June 25, 1976, pursuant to a Santa Fe district court order, Western Investors reinsured and assumed all of Western American's policy obligations subject to substantially reduced policy benefits and cash surrender values. Moreover, the court approved plan allowed Western Investors to carry the assets received from Western American on the Western Investors balance sheet at an admitted value of $2,000,000. This asset allowance was set to expire in 1981. In June of 1981, just before the asset allowance expired, the Western Investors management abandoned the entire company into receivership.

The determination of the status of Western Investors as of April 9, 1975 decides this case as to both issues presented. On the effective date of the Act, Western American and Western Investors were two separate insurance companies. As to the ability of Western American to meet its contractual obligations on this date, there is no doubt. Prior to trial, the parties stipulated as follows:

Western American was unable to fulfill its contractual obligations on April 9, 1975.

Western Investors entered into the reinsurance agreement with the receiver of the insolvent Western American company and thereby assumed the policy obligations of that company. Therefore, Western Investors upon taking over Western American's business, had two classes of policies: the policies that Western Investors had originally issued and the Western American policies that Western Investors later insured. The resolution of this issue is a matter of statutory construction, *i.e.*, whether Western Investors is also excluded from the Act's coverage by Section 59–22–13(F).

In an effort to overcome the specific intent of Section 59–22–13(F), the appellee contends that it is the general policy of the Act to provide coverage to the policyholders of defunct companies. However, the Legislature added Section 59–22–13(F) to the Act to ensure that it "shall not apply to any insurer which is * * * unable to fulfill its contractual [policy] obligations on the effective date of this act [April 9, 1975]".

■ Section 59–22–4(E) defines contractual obligation to mean "any obligation under covered policies." In light of this statutory definition, the appellee urges this Court to narrowly define "policy obligations" as only those claims immediately due at any given time. The CPA testifying for the appellee included in his calculations only currently payable claims as "policy obligations" while excluding all of Western Investors' future policy obligations. We do not believe this approach is a correct one or gives a true picture of the financial ability of an insurer to fulfill its contractual obligations. Therefore, we agree with the appellant that where Section 59–22–13(F) refers to "policy obligations," it necessarily means all policy obligations.

■ It is the intent of the Legislature, as found in this very specific provision, which necessarily decides the issues on this appeal. We find that the specific intent expressed in Section 59–22–13(F) takes precedence

over the general declarations of the statute. "[A]s between two conflicting statutory provisions, the specific shall govern over the general." *City of Albuquerque v. Redding,* 93 N.M. 757, 759, 605 P.2d 1156, 1158 (1980).

If the Legislature had thought the Act's general purposes were to govern all situations it would not have added Section 59–22–13(F). Statutes must be construed so that no part of the statute is rendered surplusage or superfluous. *T.W.I.W., Inc. v. Rhudy,* 96 N.M. 354, 630 P.2d 753 (1981); *Katz v. New Mexico Department of Human Services, Income Support Division,* 95 N.M. 530, 624 P.2d 39 (1981).

Here the liberal construction of the Act as proffered by the appellee and adopted by the district court does not address the real issue of the case. The real question is, what did the Legislature intend in this particular situation? In all cases where the answer depends on the construction of a statute as applied to a particular set of facts, the intent of the Legislature controls. The chief aim of statutory construction is to give effect to the intent of the Legislature. *City of Albuquerque v. Cauwels & Davis, Management Co., Inc.,* 96 N.M. 494, 632 P.2d 729 (1981). The legislative intent in this particular case is clear. The Legislature intended to make sure that disabled companies like Western Investors and Western American were left outside the Act. All rules of statutory construction "are but aids in arriving at true legislative intent . . . and should never be used to override" [such intent]. *Janney v. Fullroe, Inc.,* 47 N.M. 423, 436, 144 P.2d 145, 153 (1943). (Citations omitted.)

Furthermore, administrative processes may not be used to circumvent the clear intent of the Legislature. Here, the appellee would have this Court exempt Western Investors from the operation of Section 59–22–13(F). The record reflects that Western Investors was indeed financially disabled but no steps were taken to correct this situation. This failure to regulate Western Investors cannot now be used as legal justification for evading the plain meaning of Section 59–22–13(F).

In construing Section 59–22–13(F), we find that the Legislature was primarily concerned with the actual financial condition of the insurer. We determine that this issue should be decided on a case by case basis. The inability exclusion was added to the statute so that exclusion from coverage would not depend solely on judicial declarations of insolvency, but rather upon a company's real financial ability derived from fundamental concepts of accounting.

It is well established that the findings of fact of the trial court, when supported by substantial evidence, cannot be disturbed on appeal. *Wilson v. Employment Security Commission,* 74 N.M. 3, 389 P.2d 855 (1963); *Galloway v. White,* 64 N.M. 470, 330 P.2d 553 (1958). Furthermore, on appeal all disputed questions of fact must be resolved in favor of the successful party, and all reasonable inferences indulged in support of the judgment. *Totah Drilling Co. v. Abraham,* 64 N.M. 380, 328 P.2d 1083 (1958). However, the evidence must be of such substance as will establish facts from which reasonable inferences may be drawn. *Tapia v. Panhandle Steel Erectors Co.,* 78 N.M. 86, 428 P.2d 625 (1967).

With the foregoing principles in mind, we have reviewed the record and fail to find substantial evidence to support the findings of the trial court.

Contrary to the findings of the trial court, the evidence present on the record shows that on April 9, 1975, Western Investors was already financially disabled. Reports submitted by Western Investors indicate that between 1971 and 1975, Western Investors maintained insufficient capital and surplus for licensure. By March of 1975, Western Investors did not have enough assets on hand to meet cash demands of its policyholders and was forced to borrow against its statutory deposit to pay overdue cash surrender demands. Moreover, testimony by the CPA who examined the books and updated Western In-

vestors' figures from December 31, 1974 to April 9, 1975, shows that the Western Investors books were grossly inflated.

The evidence presented at trial showed that Western Investors was indeed unable to fulfill its contractual obligations on April 9, 1975. Therefore, Section 59–22–13(F) excludes all of Western Investors' obligations from the Act's protection. The policies which Western Investors itself originally issued are not covered, and neither are the Western American policies which Western Investors assumed.

For the foregoing reasons we find that the trial court erred in finding that the Act applies to Western Investors' policies and the Western American policies assumed by Western Investors. Accordingly, we reverse and remand this matter to the trial court for proceedings consistent with this opinion.

IT IS SO ORDERED.

PAYNE, C.J., and FEDERICI and RIORDAN, JJ., concur.

SOSA, Senior Justice, respectfully dissenting.

SOSA, Senior Justice, dissenting.

I respectfully dissent. NMSA 1978, Section 59–22–13(F) provides that "[t]he Life Insurance Guaranty Act shall not apply to any insurer which is insolvent or unable to fulfill its contractual obligations on the effective date of the act." An insolvent insurer is defined by Section 59–22–4(F)(2) as an insurer "determined to be insolvent by a court of competent jurisdiction." Neither Western American nor Western Investors was statutorily insolvent on the effective date of the Life Insurance Guaranty Act (Act). The parties stipulated that Western American was unable to fulfill its contractual obligations on the effective date of the Act, April 9, 1975. The question before this Court is therefore whether Western Investors was unable to fulfill its contractual obligations on the effective date of the Act.

Western American was placed in receivership and declared insolvent on May 15, 1975, only a few short weeks after the passage of the Act. Western Investors, however, continued to meet its contractual obligations for three years after the passage of the Act and was not declared insolvent until 1981. In the years following the enactment of the Life Insurance Guaranty Act, NMSA 1978, Sections 59–22–1 through 59–22–17, the Guaranty Association as well as Western Investors apparently regarded Western Investors' policies as covered by the Act. Western Investors' 5,000 policyholders continued to pay premiums and the Guaranty Association taxed Western Investors as a member until 1981. Western Investors' policyholders have therefore indirectly paid for the coverage the majority opinion now denies them.

The express purpose of the Act is, *inter alia,* "to avoid financial loss to claimants or policyholders because of the insolvency of an insurer." NMSA 1978, § 59–22–2. *See New Mexico Life Insurance Guaranty Association v. Moore,* 93 N.M. 47, 596 P.2d 260 (1979). Section 59–22–17 directs that "[t]he Life Insurance Guaranty Act shall be liberally construed to effect its purpose." Other courts in resolving guaranty act interpretation questions have held that "the act must be interpreted to protect policyholders and claimants and to advance their interests rather than the interests of the Association." *New Jersey Property-Liability Insurance Guaranty Association v. Sheeran,* 137 N.J.Super. 345, 351, 349 A.2d 92, 95 (1975). *See also Louisiana Insurance Guaranty Association v. Guglielmo,* 276 So.2d 720 (La.App.1973); *Mississippi Insurance Guaranty Association v. Gandy,* 289 So.2d 677 (Miss.1973). Policyholders understandably continued to pay premiums and buy policies after the effective date of the Act from companies that continued to pay claims. These policyholders have a right to expect their companies to be covered by the Act.

The asset evaluations relied on by the majority in determining that Western Investors was unable to meet its contractual obligations on April 9, 1975 are not those reported by the company on the effective date of the Act. The figures used to identi-

fy Western Investors as "disabled" in 1975 are revised estimates of Western Investors' assets and liabilities in April of 1975 that are based on information that came to light after an examination of Western Investors' books *seven years later*. I cannot believe that the Legislature intended to exclude from the Act's coverage, many years after the Act's effective date, those insolvent companies whose reconstructed balance sheets allegedly disclosed, on April 9, 1975, a risk of future failure. Such an interpretation creates uncertainty as to the Act's application and results in a narrow construction that serves only the insurance industry, not the policyholders the Act was designed to protect.

Even using the Guaranty Association's "hindsight" analysis, it is far from clear that on April 9, 1975, Western Investors was unable to pay its future policy obligations and was therefore destined to fail. In view of the receiver's accountant's testimony that with better management Western Investors need not have failed, the trial court's finding that Western Investors was not unable to meet its current and future policy obligations would seem to me to be reasonable and supported by substantial evidence.

I would hold that the policies of Western Investors are covered by the Act, including the policies acquired from Western American. The Guaranty Association has not challenged the trial court's finding that:

> Western Investors' acquisition of Western American assets and policies in 1976 was done appropriately, with Court approval, as a legitimate transaction, and there has never been any common ownership, control or legal affiliation between Western Investors and Western American which would make the transaction suspect. The acquisition of former Western American insurance and assets by Western Investors was not the cause of Western Investors' ultimate insolvency.

Western Investors' reinsurance of Western American policies resulted in drastically reduced policy benefits with no corresponding reduction in premiums. The fact that Western American policies were not covered by the Act in 1975 does not justify the exclusion of Western Investors' policies from the Act's coverage merely because those policies were originally issued by Western American. The Guaranty Association is not being asked to cover losses that took place prior to Western Investors' acquisition of Western American's policies.

The majority's interpretation of Section 59–22–13(F) is not supported by legislative design or by logic, and it is inconsistent with the expressed purposes of the Act. The judgment of the trial court should be affirmed.