# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2021-NMCA-001

Filing Date: April 1, 2020

No. A-1-CA-36469

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**JOSEPH APODACA,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Alisa Hart, District Judge**

Certiorari Granted, November 25, 2020, No. S-1-SC-38288. Released for Publication March 9, 2021.

Hector H. Balderas, Attorney General
Santa Fe, NM
M. Victoria Wilson, Assistant Attorney General
Albuquerque, NM

for Appellee

The Law Office of Ryan J. Villa
Ryan J. Villa
Richelle Anderson
Albuquerque, NM

for Appellant

## OPINION

**BOGARDUS, Judge.**

**{1}** Defendant Joseph Apodaca appeals his conviction of two counts of first-degree criminal sexual penetration resulting in great bodily harm or great mental anguish (CSP), contrary to NMSA 1978, Section 30-9-11(D)(2) (2009), and one count of tampering with evidence, contrary to NMSA 1978, Section 30-22-5(B)(1) (2003). For the

reasons that follow, we conclude that the district court erred by refusing to instruct the jury on Defendant's mistake of fact defense. Accordingly, we reverse Defendant's convictions and remand for a new trial. Additionally, because it is likely to reoccur on remand, we also address Defendant's bifurcation argument and conclude that bifurcation is not required by the Criminal Sentencing Act or the United States Constitution.

**BACKGROUND**

**{2}** Defendant and Victim were middle school acquaintances who reconnected via Facebook in March 2014. On May 28, 2014, Victim drove from her home in Phoenix, Arizona, to Belen, New Mexico, to visit her family. Victim agreed to meet Defendant and his cousin, Dustin Leake, the next evening in Albuquerque, New Mexico. Defendant and Leake drove from Grants, New Mexico, to Albuquerque to meet Victim.

**{3}** At approximately 9:48 p.m., Defendant and Leake arrived in Albuquerque and parked in a parking lot behind the Lotus Nightclub (Lotus). Defendant and Leake had purchased a six-pack of beer before leaving Grants, and each consumed three beers while driving to Albuquerque and waiting for Victim to arrive. Victim arrived shortly thereafter and, according to disputed testimony, either drank an entire miniature bottle of alcohol or half of a miniature bottle of alcohol, with Defendant drinking the other half. The three went into Lotus at approximately 10:00 p.m. and went upstairs where alcohol was served.

**{4}** Once inside, each consumed approximately three to five rounds of drinks consisting of shots, beers, and mixed drinks. At some point, Defendant offered to hold Victim's car keys for her because she had left her purse in her car. Victim recalled drinking the first three shots and giving her keys to Defendant but had no memory of any subsequent events that evening.

**{5}** Defendant and Leake testified that after the first four drinks, Victim and Defendant were kissing and holding hands. About an hour and a half after arriving at Lotus, Leake told Defendant and Victim to "go outside" and gave Defendant the keys to his truck. According to Leake, Defendant and Victim did not linger after he gave Defendant his keys, instead they got up and left. Defendant admitted that he was drunk when they left Lotus. Defendant testified that Victim "must have been feeling good, too[.]" However, Defendant further testified that Victim "was talking alright" and was able to walk out of Lotus unassisted, which Defendant said required Victim to cross two dance floors and navigate twenty-five to thirty stairs. Defendant stated that he was not concerned about Victim's level of intoxication at the time. The bouncer at Lotus testified that that he did not recall any member of the staff escorting anyone out for being overly intoxicated on the night in question.

**{6}** Defendant testified to the following: Once outside, Defendant and Victim had sex in the back seat of Leake's truck. Defendant "pulled [Victim's] shorts off" and they started to engage in penile-vaginal intercourse and oral sex. Victim then began inserting

her own fingers into her anus, and Defendant "helped her" by penetrating Victim vaginally and anally with his fingers. Defendant penetrated Victim vaginally with all five fingers just past his knuckles in the shape of a "duckbill." After doing this, he anally penetrated Victim with four fingers. Defendant believed Victim was participating and enjoying herself because, throughout the sexual activity, Victim repeatedly stated "more" and "harder" and "she never expressed that she wanted [Defendant] to stop or anything like that." Defendant stopped after Victim defecated. He cleaned up using Victim's shorts and then "threw [the shorts] in [the] dumpster." Victim "seemed like she was kind of embarrassed," but she did not indicate or appear as if she was in pain, suffered an injury, or needed medical attention. Although Defendant did see some blood on the backseat of the truck and Victim's legs, he thought the source of the blood was from her menstrual cycle. Because Victim did not have any shorts on, Defendant called Leake and told him to come outside.

**{7}**     Leake testified that when he got to his truck, he saw Defendant standing outside the truck with the rear passenger door open, and Victim sitting in the rear passenger seat. According to Leake, Victim was awake, conscious, talking without slurred speech, and not exhibiting signs of pain. Leake testified there was blood smeared on the rear seats as well as on Victim's shirt and legs. Leake further testified that Victim got out of the truck on her own and into the rear passenger seat of her car.[1] Defendant testified that Victim was wearing "[j]ust her shirt and whatever she had on" at that time.

**{8}**     According to both Defendant and Leake, Victim "was too drunk" to drive, so they decided that Defendant would drive Victim back to Belen while Leake followed in his truck. Defendant admitted he and Leake "were kind of racing, [they] were going really fast, probably over a hundred[,]" and that they got to Belen in about twenty minutes. Defendant testified that Victim was giving him oral sex and attempted to climb onto his lap while he was driving on the freeway. Defendant then testified that Victim was unable to give directions to her home after giving him instructions on what exit to take from the freeway, and Defendant became lost in Belen. At that point, Defendant testified he was "[k]ind of" concerned about Victim's state of intoxication though he claimed he "wasn't aware of her medical state." According to their testimony, Defendant and Leake met up at a parking lot in Belen to determine what to do. Because Victim was too drunk to place a call, Defendant and Leake used her phone to call her father "so that he could come and get her[.]"

**{9}**     Victim's father testified that he received a call at 1:50 a.m. from Defendant on Victim's phone. During that phone call, Defendant indicated that he had Victim but she did not know where she lived. Victim's father agreed to meet them at a dirt parking lot at the intersection of Main Street and Didier. Victim's father asked them to remain with

---

1At trial, various portions of Leake's pretrial statements—sworn and unsworn—were read into the record, including that Leake had previously told officers that Defendant "loaded" the Victim into her car, he saw "a lot of blood," he said "this girl is bleeding a lot," and that he told officers "it looks like [Victim] got raped in the back of my truck."

Victim until he arrived, but they refused. Victim's father testified that he heard one of them say, "Dump her here, man. Let's go. Let's go."

{10}    When Defendant and Leake believed Victim's father was approximately five minutes away,[2] they left in Leake's truck, leaving Victim alone. Victim was found by her father in an empty parking lot alone and bleeding in the passenger seat of her car with only a top on. Blood was all over her legs, running down her legs, under her shoes, and on the floor mat. There was also blood on the console, the passenger-side headrest, and all over the passenger seat. Victim was unconscious, her eyes were rolled back in her head, and her father was unable to wake her. Approximately ten minutes after receiving the first call from Defendant, Victim's father called 911. Officers responded quickly because a concerned citizen had already called to report suspicious activity in the parking lot.

{11}    Officer Amanda Torres testified that upon seeing Victim in the car, unconscious and breathing, she called for medical assistance. Officer Torres noted Victim had blood on her arms and hands and "from her vaginal area all the way down to her legs towards her feet." Officer Torres attempted to wake Victim by calling her name and shaking her shoulder, but Victim did not respond at first. Officer Torres testified that, eventually, Victim opened her eyes, which "were kind of rolling back in her head[,] and her head was bobbing back and forth." Officer Torres's lapel camera was operating at the time and was later played for the jury.

{12}    Paramedics then arrived, and with the assistance of Officer Torres, lifted Victim out of the car, placed her onto a gurney, and into the ambulance. During the ambulance ride, Victim was intermittently conscious but never really understood what was happening. Paramedics were concerned that Victim might be in shock and believed this was a life-threatening situation. When asked, Victim told the paramedics that she was not in any pain; however, when the paramedic palpated Victim's abdomen, Victim said that it hurt. Victim was transported to the University of New Mexico Hospital (UNMH) in Albuquerque for immediate care.

{13}    At the hospital, doctors determined that, among other injuries, Victim suffered a deep, ten-centimeter laceration to the vaginal wall "that extended from nearly the opening of the vagina, nearly to the top"; two smaller tears to the vaginal wall; a rupture of the anal sphincter; and a ten-centimeter, full-thickness[3] tear to the rectal wall beginning at the anal sphincter. The two large tears were considered life-threatening due to blood loss and risk of infection. During an initial emergency operation, and because visualization of Victim's vagina was so difficult due to it being dilated and swollen, doctors sutured only the ten-centimeter tear to the vaginal wall, performed

---

2Through the ongoing communication regarding their respective locations in Belen, Defendant and Leake left when they believed Victim's father was approximately five minutes away.
3A full-thickness tear penetrates all the layers of the rectal wall to the abdominal cavity. We recognize that there is a discrepancy in the record regarding the extent of the rectal tear.

vaginal packing,[4] and placed a colostomy bag to prevent infection in the anal cavity. After the emergency operation, a sexual assault nurse examiner (SANE) performed an examination and documented bruising to Victim's lips and back as well as abrasions to her nipples. The SANE examination also noted bruising, swelling, and scraping to her left knee and shin. The initial blood collection,[5] which occurred at approximately 3:25 a.m., was tested for alcohol and revealed a Blood Alcohol Content (BAC) of 0.18. At 11:45 a.m. the same day, the hospital drew blood and found the BAC level to be 0.03. Victim spent fifteen days in the hospital and underwent various follow-up procedures, including treatment for infection caused by the anal tear and treatment for inability to urinate (caused by extreme inflammation[6] to the bladder). Victim testified that she would never have consented to the sexual activity Defendant described nor would she have consented to any activity that resulted in the injuries she suffered.

**{14}** After leaving Victim, Defendant and Leake then drove back to Albuquerque where they stopped at a restaurant to eat. At the restaurant, Leake saw blood on Defendant's hands, and Defendant told Leake that he had "fisted"[7] Victim. Leake became worried at that point that Victim was injured. After eating, Defendant and Leake drove back to Grants. During the return drive, Leake told Defendant that he "needs to save those text messages and everything because something is going to come up." The following afternoon Defendant texted Victim, "You okay??" and "I hope so." On the same day that he sent those text messages, Defendant also cleaned the backseat of Leake's truck with Windex and paper towels or a rag.

**{15}** Defendant was charged with two counts of CSP, two counts of tampering with evidence, one count of false imprisonment, and one count of larceny. The State also alleged aggravating circumstances and requested enhanced sentencing pursuant to NMSA 1978, Section 31-18-15.1 (2009). In addition to Victim's trial testimony, the State presented testimony from five treating physicians, one emergency room (ER) nurse, a SANE, and three expert medical witnesses. All of the medical experts testified to the rarity of Victim's injuries and that the injuries were consistent with nonconsensual sex. One of the medical experts, Dr. Daniel Sheridan, a forensic examination and forensic wound expert, testified that the injuries to Victim's vagina could have resulted from penetration with Defendant's hand in either a "fist" position or a "duckbill" position. Dr. Sheridan further testified that the injuries to Victim's anus could have resulted from penetration with Defendant's fingers only, but that in his opinion the severity of the injuries were more consistent with the penetration of Defendant's hand, in either position.[8]

---

[4]Vaginal packing entails placing cotton into the vaginal canal to keep the wound open to allow drainage and assist healing.

[5]The blood sample was collected from one of the wound sites during treatment in the emergency room.

[6]Described as "ruptured blood vessels, almost consistent with bruising localized to that area."

[7]Defendant clarified at trial that his use of the term "fisted" generally referred to the use of his hand for penetration, not a specific positioning of the hand during penetration.

[8]Dr. Sheridan's testimony was based upon his opinion that the anal tear began deeper into the anus than the treating physicians testified.

**{16}** The State also presented testimony from two expert forensic toxicologists. The first, Dr. Rong-Jen Hwang, estimated through a retrograde extrapolation that Victim's BAC at 1:00 a.m. could have been approximately 0.23. Dr. Hwang testified that Victim's BAC would have been higher at 1:00 a.m. than 2:00 a.m., if Victim had stopped consuming alcohol at approximately 11:00 p.m. or midnight. The second expert forensic toxicologist, Dr. Cynthia Morris-Kukoski, agreed.

**{17}** Dr. Morris-Kukoski explained that according to the Dubowski Stages of Acute Alcoholic Influence and Intoxication chart, a BAC of 0.23 could either place Victim in the excited state of intoxication, where the BAC can range from 0.09 to 0.25, or the confused stage, where the BAC can range from 0.18 to 0.3. An individual in the excited stage can exhibit symptoms of "loss of critical judgment, impaired perception, memory, comprehension, decreased sensory response, impaired balance and drowsiness." Additionally, an individual can be blacked-out, yet lucid and capable of complex tasks including "driving vehicles, going out and emptying out their bank account." During the confused stage, an individual can exhibit symptoms of "disorient[ation], hav[ing] mental confusion, dizziness, hav[ing] an increased pain threshold, increased muscle incoordination, slurred speech, apathy and lethargy." Dr. Morris-Kukoski saw indications in the lapel video that Victim was in the confused stage at 2:00 a.m., including that "she was slumped over, . . . difficult to 'arouse' [sic] [, and w]hen she was talking, her speech was slurred." Although no expert was certain what phase she was in at the time of the sexual activity, all experts agreed that Victim was in either the excited or the confused stage of intoxication.

**{18}** Victim testified that since her release from the hospital, she has undergone two additional surgeries for removal of the colostomy bag and repair to her anal sphincter. At the time of the trial, previous attempts to repair the anal sphincter had been unsuccessful, and Victim did not possess complete control over her anal sphincter, which affected her mental health and ability to work.

**{19}** After presentation of the State's evidence, the district court dismissed the false imprisonment and larceny charges for insufficient evidence. Defendant's theory of the case was that he did have sex with Victim, including the use of his hand to penetrate Victim vaginally and anally; however, he believed she was capable of and did consent to the sexual activity because she encouraged and participated in the acts. Further, Defendant contended that he was unaware of Victim's injuries or her need for medical attention.

**{20}** The jury found Defendant guilty of two counts of CSP and one count of tampering with evidence. Additionally, the jury found the presence of seven aggravating factors, which were set forth in separate special verdict forms. The district court, however, did not apply an enhanced sentence and sentenced Defendant to eighteen years for each count of CSP and three years for tampering with the evidence. The CSP sentences are to be served consecutively, but concurrently with the tampering with evidence sentence, for a total of thirty-six years of incarceration. This appeal followed.

## DISCUSSION

**{21}** Defendant presents four arguments in this appeal: (1) the district court violated statutory procedure and Defendant's right to a fair trial when it refused to bifurcate the guilt-innocence phase from the sentencing phase of trial; (2) the district court erred as a matter of law in refusing to instruct the jury on Defendant's mistake of fact defense as to both the CSP counts and the tampering with evidence count; (3) the district court's admission of cumulative, scientifically unreliable expert testimony that Victim's injuries were caused by nonconsensual sex invaded the province of the jury and was reversible error; and (4) cumulative error deprived Defendant of a fair trial.

**{22}** Because we agree that the district court erred in refusing to instruct the jury on Defendant's mistake of fact defense, we address his instructional argument first. While our conclusions on Defendant's claimed instructional errors are dispositive of this appeal, we also address whether bifurcation was required by the Criminal Sentencing Act or the United States Constitution because this issue is likely to reoccur on remand. We do not address Defendant's remaining arguments.

## I.    Defendant's Request for a Mistake of Fact Instruction

**{23}** At trial, the State proceeded under two theories as to the CSP counts: (1) Defendant had either used physical force or physical violence without the consent of Victim; or (2) Victim did not have the capacity to consent, and Defendant knew or had reason to know of her incapacity. Defendant proceeded on the theory that he was mistaken regarding whether Victim could and did consent to the use of physical force or physical violence. As such, Defendant tendered a mistake of fact instruction, modeled after UJI 14-5120 NMRA.

**{24}** A confusing and muddled discussion followed Defendant's tender of his proposed jury instruction. Ultimately, the district court declined to give the instruction, concluding that, as to the CSP charge, there was no need for a separate instruction on mistake of fact because such an instruction would be duplicative of the unlawfulness and elements instructions. The district court also found the instruction was not applicable to the facts at hand with respect to the tampering with evidence charge.

**{25}** Defendant argues that the district court erred by refusing to instruct the jury on Defendant's mistake of fact defense as to both the CSP and tampering with evidence counts. We begin by setting forth our standard of review. Next, we address the State's argument that Defendant abandoned or waived his request for a mistake of fact instruction as to the use of physical force or physical violence as our conclusion on this issue affects our scope of review. Finally, we analyze whether the district court improperly denied Defendant's mistake of fact instruction, first as to the CSP counts and then as to the tampering with evidence counts.

## A.    Standard of Review

**{26}**  "The propriety of jury instructions is a mixed question of law and fact." *State v. Romero*, 2005-NMCA-060, ¶ 8, 137 N.M. 456, 112 P.3d 1113. "When considering a defendant's requested instructions, we view the evidence in the light most favorable to the giving of the requested instruction." *Id.* "Viewing the facts in that manner, we review the issue de novo." *State v. Contreras*, 2007-NMCA-119, ¶ 8, 142 N.M. 518, 167 P.3d 966. "When evidence at trial supports the giving of an instruction on a defendant's theory of the case, failure to so instruct is reversible error." *State v. Brown*, 1996-NMSC-073, ¶ 34, 122 N.M. 724, 931 P.2d 69. Furthermore, even when a defendant has "offered an inadequate instruction on mistake of fact," this Court must reverse the defendant's conviction under the doctrine of fundamental error when the defendant "introduced evidence that would allow the jury to acquit under a correct statement of the law." *State v. Bunce*, 1993-NMSC-057, ¶ 15, 116 N.M. 284, 861 P.2d 965.

**{27}**  "Mistake of fact is a defense when it negates the existence of the mental state essential to the crime charged." *Contreras*, 2007-NMCA-119, ¶ 15 (internal quotation marks and citation omitted). "The [district] court need not give a mistake of fact instruction where the intent element of the crime is adequately defined by the other instructions given by the [district] court." *Id.* (alteration, internal quotation marks, and citation omitted); *see Bunce*, 1993-NMSC-057, ¶ 10 ("The critical inquiry is whether the instructions as given adequately define the intent necessary to convict[.]"). While "[t]he defense of mistake of fact also requires the defendant's mistake to be honest and reasonable[,]" such a determination "should, generally, be a question for the jury." *Contreras*, 2007-NMCA-119, ¶ 12.

## B.     Defendant Did Not Abandon or Waive His Request for a Mistake of Fact Instruction as to the Use of Physical Force or Physical Violence

**{28}**  Following the district court's denial of his request for mistake of fact instruction, counsel for Defendant objected and, as to the CSP charge, stated, "I think because consent is an affirmative defense as to the forced sexual encounter, I agree with the [district c]ourt's analysis with regard to mistake of fact[.]" The State contends this statement amounted to a waiver of the issue regarding CSP based on the use of physical force. While this statement alone could be interpreted as a waiver of the issue, the context of the statement and overall discussion of the issue do not support that conclusion.

**{29}**  When the statement is reviewed in context, it appears that Defendant was clarifying and agreeing with the district court that a mistake defense is an affirmative defense. Additionally, Defendant used the mistake theory during closing, which the State objected to and the district court allowed because it had ruled that the unlawfulness and elements instruction included mistake. For these reasons, we decline the State's invitation to conclude that a single, out-of-context statement that was made in the middle of a discussion amounts to an express or implied waiver or abandonment of the issue.

**C. The District Court Erred in Denying Defendant's Request for a Mistake of Fact Instruction as to the CSP Counts**

**{30}** The jury was instructed that the State must prove the following elements beyond a reasonable doubt for the jury to find Defendant guilty of CSP:

1. [D]efendant caused the insertion, to any extent, of his hand into the [vagina (Count 1) or anus (Count 2)] of [Victim];

2. [D]efendant used physical force or physical violence; or [Victim] was unconscious, asleep, physically helpless, or suffering from a mental condition so as to be incapable of understanding the nature or consequences of what [D]efendant was doing; and [D]efendant knew or had reason to know of the condition of [Victim];

3. [D]efendant's acts resulted in great bodily harm or great mental anguish to [Victim];

4. [D]efendant's act was unlawful;

5. This happened in New Mexico on or between May 29th through May 30th, 2014.

*See* UJI 14-958 NMRA; UJI 14-960 NMRA. As to the fourth element—unlawfulness— the jury was also instructed as follows:

> In addition to the other elements of [CSP] as charged in Counts 1 and 2, the [S]tate must prove beyond a reasonable doubt that the act was unlawful.
>
> For the act to have been unlawful it must have been without consent and with the intent to arouse or gratify sexual desire or to intrude upon the bodily integrity or personal safety of [Victim].
>
> [CSP] causing great bodily harm or great mental anguish does not include a penetration of the vagina or anus for purposes of consensual activity.

*See* UJI 14-132 NMRA. Within the framework of these instructions, it is clear that the State presented two theories to the jury on the CSP counts: (1) Defendant used physical force or physical violence without Defendant's consent; or (2) Defendant knew or had reason to know that Victim did not have the capacity to consent. We understand Defendant to be arguing that a mistake of fact instruction should have been given based on both theories, and we therefore address the propriety of the instruction under each theory.

**{31}** Under the State's first theory, Defendant could be convicted of CSP if the jury concluded that Victim did not consent to the use of physical force or physical violence. Under the facts and circumstances of this case, the jury could reach that conclusion in two ways: (1) by concluding that Victim had the capacity to consent but did not consent to the use of physical force or physical violence; or (2) by concluding that Victim *did not* have the capacity to consent and therefore could not consent to the use of physical force or physical violence.

**{32}** The unlawfulness instruction requires the jury to consider the evidence from an objective standpoint to determine whether Victim consented to the use of physical force or physical violence. It does not require the jury to consider whether Defendant knew or had reason to know of any incapacity that Victim may have been suffering from or whether Defendant reasonably believed Victim consented to the use of physical force or physical violence. *See* 65 Am. Jur. 2d *Rape* § 84 (2020) ("The consent defense differs from the reasonable belief in consent defense. Where the defendant claims the victim consented, the jury must weigh the evidence and decide which of the two witnesses is telling the truth. The defense of a reasonable belief in consent, by contrast, permits the jury to conclude that both the victim and the accused are telling the truth. The jury will first consider the victim's state of mind and decide whether she consented to the alleged acts. If she did not consent, the jury will view the events from the defendant's perspective to determine whether the manner in which the victim expressed her lack of consent was so equivocal as to cause the accused to assume that she consented where, in fact, she did not. The foundation for the reasonable belief in consent defense is evidence from which the jury could conclude the defendant acted under a mistake of fact[.]"). Failure to instruct the jury to consider Defendant's subjective knowledge would create an issue if the jury finds that Victim did not have the capacity to consent and therefore could not consent to the use of physical force or physical violence. We explain.

**{33}** When only the unlawfulness instruction is given, the jury could convict Defendant of CSP even if it found that Defendant honestly and reasonably but mistakenly believed that Victim consented to the use of physical force or physical violence. However, Defendant's mistaken belief would negate the intent necessary to convict Defendant for using physical force or physical violence to penetrate a person who did not have the capacity to consent. *See Contreras*, 2007-NMCA-119, ¶ 15 ("Mistake of fact is a defense when it negates the existence of the mental state essential to the crime charged." (internal quotation marks and citation omitted)). Accordingly, Defendant was entitled to an instruction on his mistake of fact defense if the evidence presented at trial supported such an instruction. *See Brown*, 1996-NMSC-073, ¶ 34 ("When evidence at trial supports the giving of an instruction on a defendant's theory of the case, failure to so instruct is reversible error."). When we view the evidence in the light most favorable to giving the instruction, as we must, *see Romero*, 2005-NMCA-060, ¶ 8, we conclude that evidence presented at trial supported giving the instruction on Defendant's mistake of fact defense.

**{34}** The trial evidence suggested the following: Victim could drink a lot and not feel the effects that somebody else might. Victim "was talking alright" and was able to walk out of Lotus unassisted, which required her to cross two dance floors and navigate twenty-five to thirty stairs. The bouncer at Lotus did not recall having to escort any person for being overly intoxicated on the night in question. Once Defendant and Victim were outside of Lotus and engaged in sexual activity in the backseat of Leake's truck, Victim repeatedly stated "more" and "harder" throughout the sexual activity. Victim was putting her fingers into her own anus during the sexual activity. Victim expressed enjoyment and did not express "that she wanted [Defendant] to stop or anything like that." Victim never lost consciousness nor did she state that she was in pain.

**{35}** Additionally, expert testimony presented at trial suggested the following: During the sexual activity that caused her injuries, Victim may have been in the excited stage of intoxication, in which an individual can exhibit symptoms including "loss of critical judgment, impaired perception, memory, comprehension, decreased sensory response, impaired balance and drowsiness." A person can be blacked-out, yet lucid and capable of complex tasks including "driving vehicles, going out and emptying out their bank account."

**{36}** Based on that evidence, we conclude that Defendant was entitled to mistake of fact instruction under the State's first theory—that Defendant used physical force or physical violence without Victim's consent. Whether Defendant's mistake of fact was honest and reasonable at the time of the use of physical force or physical violence was a question for the jury. *See Contreras*, 2007-NMCA-119, ¶ 12. Because the district court did not give a mistake of fact instruction, it committed reversible error. *See Brown*, 1996-NMSC-073, ¶ 34.

**{37}** We reach the opposite conclusion as to the State's second theory—that Defendant knew or had reason to know that Victim did not have the capacity to consent—because the instructions given as to this theory adequately define the intent necessary to convict. To obtain a conviction under this theory, the State was required to prove, in relevant part, that (1) Victim was incapacitated so as to be unable to consent; and (2) Defendant knew or had reason to know of Victim's incapacity. Giving Defendant's mistake of fact instruction, which asks the jury to consider whether Defendant was honestly and reasonably mistaken that Victim had the capacity to consent and did consent, would essentially be a restatement of what the instruction on this theory already tells the jury: If Defendant did not know or have reason to know of Victim's incapacity, the jury must find him not guilty under this theory. Therefore, we conclude that Defendant was not entitled to a mistake of fact instruction under the State's second theory. *See Bunce*, 1993-NMSC-057, ¶ 10; *Contreras*, 2007-NMCA-119, ¶ 15. Accordingly, the district court did not err by denying the instruction.

**{38}** For the foregoing reasons, we reverse Defendant's two CSP convictions and remand for a new trial on the same. As a final point on this issue, we note that our conclusion should not be read as addressing whether the mistake of fact instruction tendered by Defendant was an accurate statement of applicable law. That issue is not

before us. Further, our disposition of the issues in this appeal does not require us to address the propriety of the tendered instruction because, under these facts and circumstances, a properly instructed jury could have reasonably acquitted Defendant based on the evidence presented relevant to Defendant's mistaken belief that Victim had the capacity to consent. Therefore, even if Defendant's mistake of fact instruction is an improper statement of the law, we would still be compelled to reverse these convictions and remand for a new trial under the doctrine of fundamental error. *See Bunce*, 1993-NMSC-057, ¶ 15.

**D.     The Mistake of Fact as to Consent Was Improperly Denied as to Tampering With Evidence**

**{39}**    The jury was instructed that the State must prove the following elements beyond a reasonable doubt to find Defendant guilty of tampering with evidence:

1.  [D]efendant destroyed, changed, or hid blood evidence by cleaning . . . Leake's vehicle;

2.  By doing so, [D]efendant intended to prevent the apprehension, prosecution, or conviction of himself for the crime of [CSP];

3.  This happened in New Mexico on or between May 29th through May 30th, 2014.

*See* UJI 14-2241 NMRA. Defendant argues that his belief that Victim had the capacity to consent and did consent to the sexual activity entitles him to a mistake of fact instruction on the tampering with evidence count as well. We agree.

**{40}**    Under the facts and circumstances presented in this case, Defendant's arguments as to mistake of fact are relevant to both the CSP counts and the tampering counts. If the jury were to conclude that Defendant, at the time that he cleaned Leake's truck, had an honest and reasonable belief that Victim had the capacity to consent and did consent to his actions, the jury could also reasonably conclude Defendant necessarily lacked the intent necessary to convict him for tampering with evidence. For that reason, we conclude that Defendant was entitled to the mistake of fact instruction as to the tampering with evidence count. Accordingly, it was reversible error for the district court to not instruct on Defendant's mistake of fact defense as to the tampering with evidence charge, and we remand for a new trial on that count. *See Brown*, 1996-NMSC-073, ¶ 34.

**{41}**    In reaching our conclusion, we note, as did the State, that there was additional evidence presented about what occurred after Defendant and Victim's sexual activity at Lotus but before he cleaned Leake's truck. Specifically, the State directs our attention to testimony that Leake told Defendant that Defendant "needs to save those text messages and everything because something is going to come up." However, to consider evidence that undercuts giving the instruction would be inapposite to our

standard of review, which requires us to view the evidence in the light most favorable to giving the instruction. *See Romero*, 2005-NMCA-060, ¶ 8. Instead, such evidence can be properly considered by the jury when they are making their determination of whether Defendant's mistake of fact was honest and reasonable at the time that he cleaned Leake's vehicle. *See Contreras*, 2007-NMCA-119, ¶ 12. Finally, as we fully explained in the previous section, our conclusion should not be read as addressing whether the mistake of fact instruction tendered by Defendant was an accurate statement of applicable law.

## II. The Criminal Sentencing Act Does Not Require Bifurcation and Bifurcation Is Not Constitutionally Required

**{42}** Defendant argues the district court violated the statutory procedure of the Criminal Sentencing Act (the Act), specifically the procedure set forth in Section 31-18-15.1, and his right to a fair trial by denying his request to bifurcate the determination of guilt from the determination of aggravating circumstances. Our analysis on this point proceeds in two parts. First, we explain that the Act does not require bifurcation. Second, we explain that bifurcation is not constitutionally required.

### A. The Act Does Not Require Bifurcation

**{43}** Whether or not the Act requires bifurcation is a matter of statutory construction. We review matters of statutory construction de novo. *State v. Johnson*, 2009-NMSC-049, ¶ 9, 147 N.M. 177, 218 P.3d 863. "The principal command of statutory construction is that the court should determine and effectuate the intent of the [L]egislature using the plain language of the statute as the primary indicator of legislative intent[.]" *State v. Ogden*, 1994-NMSC-029, ¶ 24, 118 N.M. 234, 880 P.2d 845 (citation omitted). When not defined by the statute, words "should be given their ordinary meaning absent clear and express legislative intention to the contrary." *Id.*

**{44}** Additionally, "statutes in pari materia should be read together to ascertain legislative intent." *Id.* ¶ 28. In other words, "[s]tatutes on the same general subject should be construed by reference to each other" as a similar statute with clearer legislative intent may illuminate an otherwise unclear statute. *Id.* "These rules also promote consistency in judicial interpretation of similar statutes." *Id.*

**{45}** Defendant argues that the Act requires a determination of a defendant's guilt or innocence *before* the jury can consider whether the crime included aggravating circumstances. Defendant cites specifically to Section 38-18-15 (A), (B), and (E) for the proposition that the Legislature intended to require a bifurcated proceeding.

**{46}** The Act provides:

> A. The court *shall hold a sentencing hearing to determine if mitigating or aggravating circumstances exist* and take whatever evidence or statements it deems will aid it in reaching a decision to alter a basic

sentence. The judge may alter the basic sentence as prescribed in [NMSA 1978,] Section 31-18-15 [(2019)] upon:

   (1)   a finding by the judge of any mitigating circumstances surrounding the offense or concerning the offender; or

   (2)   a finding by a jury or by the judge beyond a reasonable doubt of any aggravating circumstances surrounding the offense or concerning the offender.

   B.   When the determination of guilt or innocence for the underlying offense is made by a jury, the original trial jury shall determine whether aggravating circumstances exist.

   . . . .

   E.   Presentation of evidence or statements regarding an alleged aggravating circumstance *shall be made* as soon as practicable *following the determination of guilt or innocence*.

Section 31-18-15.1 (emphases added). We review the plain language of each of these subsections in turn.

**{47}**   Subsection A provides that the court "shall hold a sentencing hearing to determine if mitigating or aggravating circumstances exist." Defendant argues that a "sentencing hearing" is a separate and distinct proceeding from trial requiring bifurcation. We disagree. This Court has previously determined that, while a sentencing hearing is mandatory, it does not necessarily require a separate proceeding. *State v. Tomlinson*, 1982-NMCA-025, ¶¶ 11-15, 98 N.M. 337, 648 P.2d 795. Rather, "[a] hearing involves listening to facts and evidence for the sake of adjudication" and "includes every step where the judge is called to rule for or against a party to the cause." *Id.* ¶ 13 (internal quotation marks and citation omitted). In *Tomlinson*, we concluded that it was sufficient for a judge to make a sentencing determination at the bench where the judge had heard the evidence in the case, found mitigating and aggravating circumstances, and allowed the defendant an opportunity to add to the judge's enumeration of mitigating considerations. *Id.* ¶¶ 13, 15. While *Tomlinson* was determined prior to the requirement that juries find aggravating circumstances, it is persuasive authority that the sentencing hearing need not be a separate proceeding. *See* § 31-18-15.1 (1979) (providing the judge determines mitigating and aggravating circumstances as well as final sentencing).

**{48}**   The Act embodies two policies: (1) that the defendant is given the opportunity to present mitigating considerations, and (2) that the district court is given the opportunity to hear "whatever evidence or statements it deems will aid it in reaching a decision." *Tomlison*, 1982-NMCA-025, ¶ 14 (internal quotation marks omitted). Concerning the first policy, the Act makes clear that a jury has to determine aggravating facts beyond a

reasonable doubt; however, it does not require this be done during the same proceeding as the final sentencing determination. *See* § 31-18-15.1(A)(2). The statute also does not allow the jury to determine mitigating circumstances or determine the final sentence; those decisions are reserved for the judge. *See* § 31-18-15.1(A). We conclude that allowing the jury to determine aggravating circumstances prior to the judge's determination of mitigating circumstances and final judgment does not deprive the defendant of the opportunity to present mitigating considerations so long as the defendant is given such an opportunity before final sentencing.

**{49}**    With regard to the second policy, denial of bifurcation does not necessarily deny the defendant the opportunity to present evidence or statements to the district court. *See* § 31-18-15.1(E). If the facts are already admissible in the trial on the underlying offense, the defendant is free to present mitigating or exculpatory evidence and to argue the evidence does not support the asserted aggravating facts. Indeed, this is likely a commonly used defensive tactic. We recognize there may be instances where bifurcation is necessary, such as where otherwise inadmissible evidence proves the aggravating circumstances, or where the defendant wishes to invoke his right against self-incrimination at trial but wants to address the jury regarding aggravating circumstances.[9] In these instances and possibly others, bifurcation may be required to prevent constitutional violations or prejudice to the defendant. However, this does not mean that the Legislature intended Subsection A to require bifurcation in all cases; rather, this section was intended to allow bifurcation when necessary. *See Ogden*, 1994-NMSC-029, ¶ 27 (holding that strict construction does not require the narrowest interpretation but rather a "reasonable or common[-]sense construction consonant with the objects of the legislation, and the evils sought to be overcome").

**{50}**    Subsection B provides that the original jury, if one was impaneled for guilt, shall determine whether there are aggravating circumstances. This section is at best silent regarding bifurcation because the jury could either determine aggravating facts at the same time as guilt or be called back for a separate proceeding. We will not read language requiring bifurcation into the statute. *See State v. Chadwick-McNally,* 2018-NMSC-018, ¶ 21, 414 P.3d 326 ("We do not read language into the Act that is not

---

9A review of the six statutes upon which our statute was based revealed only two instances in which bifurcation is described as necessary under the statute: where otherwise inadmissible facts would be necessary to prove aggravation and where it would unfairly prejudice Defendant. *See* Fiscal Impact Report for H.B. 208, *Proof of Aggravating Circumstances Standards*, 49th Leg., 1st Sess. (N.M. 2009), at 3, *available at* https://www.nmlegis.gov/Sessions/09%20Regular/firs/HB0208.pdf (noting that the approach adopted by "the New Mexico Sentencing Commission has already been enacted in the following states: Kansas, Arizona, Minnesota, North Carolina, Oregon, and Washington"); Kan. Stat. Ann. §§ 21-6815 (West 2019), 21-6817 (West 2019); Minn. Stat. Ann. § 244.10(5)(b) (West 2009); Or. Rev. Stat. Ann. § 136.770(4) (West 2005); Wash. Rev. Code Ann. § 9.94A.537 (West 2007); *but see* Ariz. Rev. Stat. Ann. § 13-701 (2018) (silent as to bifurcation); N.C. Gen. Stat. Ann. § 15A-1340.16(a1) (West 2015) (bifurcation allowed where justice requires it). Additionally, the only states reviewed that statutorily require bifurcation for all criminal cases are states where juries determine not only the presence of aggravating facts, but also the final sentence. *See* Tex. Code Crim. Proc. Ann. art. 37.07 (West 2019); Va. R. S. Ct. Rule 3A:17.1 (West 2012).

there." (internal quotation marks and citation omitted)). We therefore hold that this subsection neither requires nor prohibits bifurcation.

**{51}**    Subsection E provides that "[p]resentation of evidence or statements regarding an alleged aggravating circumstance shall be made as soon as practicable following the determination of guilt[.]" Defendant argues that to interpret the Act to not require bifurcation would render this subsection surplusage. *See In re Rehab. of Inv'rs Life Ins. Co.*, 1983-NMSC-082, ¶ 12, 100 N.M. 370, 671 P.2d 31 ("Statutes must be construed so that no part of the statute is rendered surplusage or superfluous."). However, this subsection does not require presentation of additional evidence or statements. Rather, it only applies where there is additional evidence or statements regarding alleged aggravating circumstances that would not otherwise be admissible at trial. In short, interpreting the Act as permissive, rather than mandatory, does not render this subsection superfluous.

**{52}**    Defendant then argues that these subsections, when read together, demonstrate clear Legislative intent to require a bifurcated proceeding. Because there is no express requirement to bifurcate, we examine whether Legislative history, purpose, or policy supports mandatory bifurcation.

**{53}**    The previous version of the Act did not address bifurcation at all. *See* § 31-18-15.1 (1979). The Legislature then amended the Act to conform to the constitutional requirement that a jury find aggravating factors. *See* H.B. 208, 49th Leg., 1st Sess. (N.M. 2009), *available at* https://www.nmlegis.gov/Sessions/ 09%20Regular/final/HB0208.pdf; *State v. Frawley*, 2007-NMSC-057, ¶ 23, 143 N.M. 7, 172 P.3d 144 (citing *Cunningham v. Cal.*, 549 U.S. 270 (2007) and holding the Capital Felony Sentencing Act (CFSA), NMSA 1978, §§ 31-20A-1 to -6 (repealed 2009), was unconstitutional because "the Sixth Amendment is violated *any time* a defendant is sentenced above what is authorized *solely* by the jury's verdict alone"), *superseded by statute as recognized by State v. Oliver*, 2020-NMSC-002, ¶ 19, 465 P.3d 1065. In the same legislative session, the Legislature amended the CFSA, by repealing the death penalty, and in so doing, repealing a guarantee of separate, bifurcated guilt and sentencing proceedings for death penalty determinations. *See* H.B. 285, 49th Leg., 1st Sess. (N.M. 2009), *available at* https://www.nmlegis.gov/Sessions/09%20Regular/final/HB0285.pdf; *Chadwick-McNally*, 2018-NMSC-018, ¶ 9 (citing the CFSA).[10]

**{54}**    The simultaneous repeal of express bifurcation requirements from one sentencing statute and the omission of similar language in another sentencing statute

---

[10]"Upon a verdict by the jury or judge that the defendant is guilty of a capital felony, or upon a plea of guilty to a capital felony, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment as authorized herein. In a jury trial, the sentencing proceeding shall be conducted as soon as practicable by the original trial judge before the original trial jury. In a nonjury trial the sentencing proceeding shall be conducted as soon as practicable by the original trial judge. In the case of a plea of guilty to a capital felony, the sentencing proceeding shall be conducted as soon as practicable by the original trial judge or by a jury upon demand of a party." NMSA 1978, § 31-20A-1(B) (1979, repealed 2009).

indicates that the Legislature did not intend to make bifurcation mandatory. The Legislature knew how to write a mandatory requirement and chose not to. *See* § 31-20A-1 (1979, repealed 2009). Had the Legislature intended to require bifurcation, surely they would have used the phrase "a separate sentencing proceeding" as they had in the prior CFSA. Section 31-20A-1(B) (1979, repealed 2009).

**{55}**   Additionally, the express language was removed from the CFSA (a more specific statute regarding more serious crimes), and omitted from the CSA (a general statute regarding sentencing for all crimes from misdemeanors to first-degree felonies). Since the repeal of Section 31-20A-1, our Supreme Court has held that the CFSA is permissive regarding bifurcation for the finding of aggravating circumstances warranting a sentence of life without parole. *Chadwick-McNally*, 2018-NMSC-018, ¶ 21. It would be inconsistent for this Court to determine that the general statute requires bifurcation while the specific statute does not. A more rational and common-sense interpretation of the Act would be that bifurcation is permissive. *See Ogden*, 1994-NMSC-029, ¶ 27.

**{56}**   We conclude that the decision to bifurcate proceedings is not mandatory but must be made on a case-by-case basis and at the discretion of the district court.

## B.      There Is No Constitutional Requirement to Bifurcate

**{57}**   To the extent Defendant contends the Fourth and Fourteenth Amendments to the United States Constitution require bifurcation, we reject this argument. We review issues of constitutionality de novo. *State v. Sanchez*, 2015-NMSC-018, ¶ 9, 350 P.3d 1169 ("If a constitutional provision applies, claims arising under it are . . . reviewed de novo."). Defendant does not cite a single case supporting the notion that bifurcation is constitutionally required in every case, nor do we find any. *See In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 (holding that where a party cites no authority to support a proposition, we assume no such authority exists and need not consider the proposition); *State v. Duttle*, 2017-NMCA-001, ¶ 15, 387 P.3d 885 ("For this Court to rule on an inadequately briefed constitutional issue would essentially require it to do the work on behalf of [the d]efendant."). In fact, our Supreme Court in *Chadwick-McNally* declined "to require or permit bifurcated proceedings *as a matter of course* absent clear directive from the Constitution" when interpreting the CFSA. 2018-NMSC-018, ¶ 21 (internal quotation marks and citation omitted); *see also*, *McGautha v. California*, 402 U.S. 183, 219-20 (1971) (holding that the defendant's constitutional rights were not infringed by jury's determination of guilt and penalty after single trial and single verdict), *vacated on other grounds by Crampton v. Ohio*, 408 U.S. 941 (1972); *United States v. Taylor*, 635 F. Supp. 2d 1236, 1241 (D.N.M. 2009) ("The Constitution permits a jury to consider both guilt and capital punishment at the same time."); *United States v. Johnson*, 362 F. Supp. 2d 1043, 1103 (N.D. Iowa 2005) (noting that the Constitution only requires any aggravating factor, without which the death penalty cannot be imposed, be proved to a jury beyond a reasonable doubt). Finding no case law to the contrary, we hold that, while individual cases may implicate constitutional concerns, there is no constitutional mandate of bifurcation in every case.

**CONCLUSION**

**{58}** We reverse Defendant's convictions for two counts of CSP and one count of tampering with evidence and remand for a new trial on those counts. Additionally, we hold that the Criminal Sentencing Act does not require bifurcation and that bifurcation is not constitutionally required.

**{59}** **IT IS SO ORDERED.**

**KRISTINA BOGARDUS, Judge**

**I CONCUR:**

**BRIANA H. ZAMORA, Judge**

**LINDA M. VANZI, Judge (concurring in part and dissenting in part)**

**VANZI, Judge (concurring in part and dissenting in part).**

**{60}** I concur in the majority's opinion as to Part II concerning bifurcation. However, I respectfully disagree with the majority's conclusion in Part I that Defendant was entitled to a mistake of fact instruction for both the CSP and tampering with evidence counts. In my view, the district court properly denied the instruction as to CSP because Defendant's testimony regarding his state of mind did not support Defendant's belief that Victim consented. The instruction was also properly denied as to tampering because Defendant's belief does not negate the intent element of tampering with evidence. Accordingly, I dissent.

**Mistake of Fact Was Properly Denied as to Criminal Sexual Penetration**

**{61}** As an initial matter, I agree with the majority that under the use of physical force or physical violence theory, the jury could convict Defendant either "(1) by concluding that Victim had the capacity to consent but did not consent to the use of physical force or physical violence; or (2) by concluding that Victim *did not* have the capacity to consent and therefore could not consent to the use of physical force or physical violence." Majority Op. ¶ 31. I also agree that under the incapacitation theory, the jury could convict Defendant either by concluding, "(1) Victim was incapacitated so as to be unable to consent; and (2) Defendant knew or had reason to know of Victim's incapacity." *Id.* ¶ 37. However, in my opinion, Defendant's stated belief at trial is not supported by the rest of his testimony regarding his state of mind at the time and, therefore, a mistake instruction is not warranted. I recognize that this case presents a close call and explain my analysis as follows.

**{62}** Mistake of fact occurs where the mistaken fact "[negates] the existence of an intent essential to the commission of an offense[.]" *State v. Roque*, 1977-NMCA-094, ¶ 17, 91 N.M. 7, 569 P.2d 417 (internal quotation marks and citation omitted). "Ignorance

or mistake of fact exists when the defendant does not know what the facts actually are or believes them to be other than as they are." *Id.* (internal quotation marks and citation omitted). The belief element in the mistake of fact instruction requires that Defendant had subjective or actual knowledge of consent. *See Contreras*, 2007-NMCA-119, ¶ 11 (holding that under the burglary statute, the belief element in the mistake of fact instruction requires subjective or actual knowledge of permission to enter). "Generally, a mental state can be proved by circumstantial evidence." *Id.* ¶ 10. "Evidence supporting a defense theory can be introduced in either the defendant's case or the [s]tate's case." *Id.* Additionally, mistake of fact requires a defendant's mistake to be honest and reasonable. UJI 14-5120. The issue of reasonableness is generally a question for the jury. *Contreras*, 2007-NMCA-119, ¶ 12.

**{63}** The issue here is whether there was sufficient evidence that Defendant believed Victim was capable of and did consent to the activity. *See* UJI 14-961 NMRA (defining, in part, that one element of CSP to be proved is that the defendant acted unlawfully); UJI 14-132 (defining unlawful, in part, as having been done without consent). Under either theory, the jury had to find that Victim was incapacitated, but that Defendant had a reasonable and honest belief she could consent. To be entitled to the defense and an acquittal, the jury must then have been able to find that Defendant had an honest and reasonable belief Victim did consent to all the sexual activity—including the use of force.

**{64}** The evidence viewed in the light most favorable to giving the instruction is as follows. Defendant admitted that he and Victim, in each other's presence, drank at minimum five and six shots respectively, in approximately an hour and a half. Defendant admitted that prior to leaving Lotus, he was drunk and "feeling pretty good," and Victim "must have been feeling good, too[.]" Defendant at that time was not concerned about her level of intoxication, apparently because she was alert, capable of walking downstairs, dancing with and kissing him, and willingly went to Leake's truck with him. Leake's testimony corroborated Defendant's testimony, and, inferentially, so did the bouncer's testimony. Defendant admitted to using his hand "just past the knuckles" to penetrate Victim vaginally. Defendant testified that Victim was participating in the activity, verbally encouraging him, and enjoying the activity, so he used his other hand to penetrate her anus with four fingers. Defendant did not admit to using physical force to insert his hands into Victim's vagina and anus. Yet the sexual activity included two separate penetrations, each of which caused an independent and severe injury. At trial, Defendant claimed to have been unaware of these injuries but admitted that he saw blood on Victim's legs and on the seat. After the sexual activity, Defendant testified that Victim was awake, embarrassed, and not showing signs of being in any pain. Leake also testified that when he came outside, either at 11:38 p.m. or 12:24 a.m.,[11] Victim was awake, conscious, speaking with no slurring, and not showing any signs of pain. Nevertheless, Defendant admits he put Victim in her car and drove her vehicle to Belen because she "was too drunk" to drive. The experts estimated Victim's BAC at 1:00 a.m., about a half-hour to an hour and a half after the sexual activity, was approximately 0.23, or almost three times the legal limit. Therefore, she could have been in either the

---

[11]There were two documented phone calls from Defendant to Leake; neither could identify which one was the call in which Defendant asked Leake to join them.

excited stage of intoxication and capable of complex tasks, or the confused stage whereby she would be exhibiting symptoms of "disorient[ation], . . . mental confusion, dizziness, . . . an increased pain threshold, increased muscle incoordination, slurred speech, apathy and lethargy." Finally, the State's experts testified that it was unlikely the injuries were caused by consensual sex, especially due to the pain Victim would have been in after one of the injuries.

**{65}**    From this evidence, I conclude that a jury could not have found that Defendant reasonably and honestly believed that Victim was capable of consenting and did consent to the sexual activity, including the use of force, particularly when Defendant did not admit to using force or violence. Experts estimated that at 1:00 a.m., Victim's BAC was 0.23 and, at best, Victim experienced a "black-out." Defendant admitted that he observed Victim ingest six shots in one and a half hours; that she was drunk and unable to drive herself home; and that he penetrated her with such force he caused two separate life-threatening injuries. Defendant may not have been concerned about Victim's level of intoxication, but that does not mean that he was unaware of it. In fact, Defendant does not claim Victim was not intoxicated, but rather that he reasonably believed she could consent after drinking six shots in an hour and a half.[12] Under these circumstances, no reasonable person would have believed that Victim could have consented to the alleged sexual activity that resulted in the injuries suffered by Victim. Whether Defendant possessed an honest and reasonable belief that Victim did consent is therefore irrelevant. Accordingly, I would hold that the district court properly denied Defendant's mistake of fact instruction as to whether Victim consented to sexual penetration by the use of physical force or physical violence.

**Mistake of Fact Was Properly Denied as to Tampering With Evidence**

**{66}**    The majority opinion concludes Defendant is entitled to the instruction because "if the jury were to conclude that Defendant, at the time that he cleaned Leake's truck, had an honest and reasonable belief that Victim has the capacity to consent and did consent to his actions, the jury could also reasonably conclude Defendant necessarily lacked the intent necessary to convict him for tampering with evidence." I respectfully disagree that Defendant's belief necessarily would negate the required intent. The majority's conclusion fails to address the key inquiry of a mistake of fact defense. A mistake of fact occurs where the mistaken fact "[negates] the existence of an intent essential to the commission of an offense[.]" *Roque*, 1977-NMCA-094, ¶ 17 (internal quotation marks and citation omitted). In other words, if the mistaken belief is found to be reasonable and honest, the jury has no option other than to acquit Defendant. Here, to convict Defendant of tampering with evidence, the jury had to find (1) "[D]efendant destroyed, changed, or hid blood evidence by cleaning . . . Leake's vehicle"; and (2) "by doing so,

---

[12]I do not intend to express an opinion on whether there is a magic number of drinks over a certain period that would render a person incapable of consenting to forceful sexual activity and limit my analysis to the fact of this case. In sum, based on the testimony at trial, this circumstance is clearly beyond what a rational person would believe another person could consume and still be able to give consent.

[D]efendant intended to prevent the apprehension, prosecution, or conviction of himself for the crime of criminal sexual penetration[.]"

{67}   Defendant testified that when he cleaned Leake's truck, he did not think he was covering up a crime; rather he cleaned the truck because "it needed to be cleaned and it wasn't—[Leake] would have had to clean it, because, I mean . . . we made the mess[.]" The evidence presented in support of Defendant's belief was his own testimony and actions after the sexual activity and before cleaning Leake's truck as well as other witness' testimony regarding Victim's appearance and actions shortly before and immediately after the sexual activity. Defendant testified that he was unaware Victim was injured and believed the blood in Leake's truck to have been from Victim's menstrual cycle, despite Leake's statement that it was a lot of blood. Leake also testified that he told Defendant on the return trip to save his text messages, because something would come up. Then, the following day, Defendant texted Victim asking if she was okay, and cleaned blood from the seat of Leake's truck.[13] Defendant's tendered instruction provided that Defendant "believed that [Victim] consented to the sexual activity that occurred, her injuries were accidental and she was not seriously injured."

{68}   If the jury credited Defendant's belief that Victim was able to and did consent, a reasonable jury could have found either that Defendant's only intent was to clean the truck, as he stated, or that—despite his believed innocence—he intended to prevent apprehension, prosecution, or conviction as Leake had warned him that, in effect, the situation looked suspicious. Under the first, the jury must acquit; under the second, the jury must convict. As his belief could have led to either an acquittal or conviction, it did not negate the intent element, and he was not entitled to the instruction. I would hold that the instruction was properly denied.

{69}   For the reasons set forth above, I would affirm Defendant's convictions and, therefore, respectfully dissent.

**LINDA M. VANZI, Judge**

---

13The majority opinion determines that Leake's testimony and Defendant's other acts are only relevant as to the determination of whether Defendant's mistake of fact was honest and reasonable at the time. However, facts in evidence can serve multiple purposes. These facts serve as evidence of both the reasonableness of Defendant's belief and circumstantial evidence of Defendant's state of mind. Therefore, we consider them on review of the application of the mistake defense. *See* Contreras, 2007-NMCA-119, ¶ 10 ("Generally, a mental state can be proved by circumstantial evidence.").