The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Opinion Number: _____**

**Filing Date:** February 6, 2025

**NO. S-1-SC-38288**

**STATE OF NEW MEXICO,**

Plaintiff-Petitioner,

v.

**JOSEPH R. APODACA,**

Defendant-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Alisa Hart, District Judge**

Hector H. Balderas, Attorney General
M. Victoria Wilson, Assistant Attorney General
Santa Fe, NM

for Petitioner

The Law Office of Ryan J. Villa
Ryan J. Villa
Richelle Anderson
Albuquerque, NM

for Respondent

**OPINION**

**THOMSON, Justice.**

{1}     A jury convicted Defendant Joseph R. Apodaca of two counts of criminal sexual penetration and one count of tampering with evidence. The Court of Appeals reversed all three of Defendant's convictions, concluding that the district court committed reversible error by declining to provide a separate instruction to the jury on Defendant's mistake-of-fact defense. *See State v. Apodaca*, 2021-NMCA-001, ¶¶ 1, 36, 40, 482 P.3d 1224. We granted the State's petition for writ of certiorari and, based on the analysis that follows, we reverse the Court of Appeals and affirm all three of Defendant's convictions. Today, we clarify that a defendant prosecuted for committing a criminal sexual penetration under both an Incapacity Theory and an Express Non-Consent Theory is not entitled to a separate mistake-of-fact instruction based on the defendant's alleged belief that the victim had the legal capacity to consent and did consent.

{2}     "Criminal sexual penetration is the *unlawful* and intentional causing of a person to engage in sexual intercourse . . . or the causing of penetration, to any extent and with any object, of the genital or anal opening[] of another, whether or not there is any emission." NMSA 1978, § 30-9-11(A) (2009) (emphasis added); *see also* UJI 14-132 NMRA ("For the act to have been unlawful, it must have been done without

consent . . . ."). The State's theory of *unlawfulness* was that Defendant *used force or coercion* to perpetrate the criminal sexual penetration. *Cf.* § 30-9-11(D)(2) ("Criminal sexual penetration in the first degree consists of all criminal sexual penetration perpetrated . . . by the use of *force or coercion* that results in great bodily harm or great mental anguish to the victim." (emphasis added)). The State's first theory of *force or coercion*, consistent with the plain language of the statutory definition of *force or coercion*, was that, based on the victim's severe intoxication, Defendant "[knew] or ha[d] reason to know that the victim [was] unconscious, asleep or otherwise physically helpless or suffer[ed] from a mental condition that render[ed] the victim incapable of understanding the nature or consequences of the [sexual penetration]" (Incapacity Theory). NMSA 1978, § 30-9-10(A)(4) (2005). The State's second theory of *force or coercion* was that Defendant "use[d] . . . physical force or physical violence" to penetrate the victim without consent (Express Non-Consent Theory). Section 30-9-10(A)(1).

{3}     Defendant was not entitled to the requested mistake-of-fact instruction because his identified mistake of fact was encapsulated within the elements of the State's Incapacity Theory, on which the jury was adequately instructed. Further, the evidence presented to the jury, mostly through the testimony of Defendant himself, was that Defendant was not mistaken as to the fact of B.C.'s (Victim) intoxication

2

or consent. As the dissent in *Apodaca* stated, "Defendant may not have been concerned about Victim's level of intoxication, but that does not mean that he was unaware of it" and therefore could not claim a mistake of fact. *Apodaca*, 2021-NMCA-001, ¶ 65 (Vanzi, J., concurring in part and dissenting in part).

## I.   BACKGROUND

### A.   The Sexual Assault

{4}   Defendant and Victim were middle school classmates in Grants, New Mexico, but lost contact after middle school and did not speak again until March 2014. The two reconnected around the same time that Victim moved from New Mexico to Phoenix, Arizona. They exchanged messages, but their communications waned and then stopped again.

{5}   About three weeks after they stopped communicating with each other, Defendant sent Victim a text message, which she received while driving back to New Mexico to visit family. They agreed to meet in Albuquerque on an evening when, as Defendant told Victim, Defendant was going to a club with some other people. However, the plan changed, and only Defendant and his cousin Dustin came to Albuquerque to meet Victim that evening.

{6}   Dustin and Defendant left Grants for Albuquerque after sunset and picked up a six-pack of beer, most of which they drank during the drive. They finished their

last two beers in a parking lot while waiting for Victim. When Victim arrived, she offered to share a miniature of flavored vodka, which she had brought with her. Although testimony differs on this point, Defendant testified that Victim drank the whole vodka miniature herself. Then, Victim, Defendant, and Dustin entered a nightclub together, went upstairs to the bar, and started drinking. The three of them took turns paying for rounds of alcohol.

{7} Victim did not remember much that occurred after she drank her third shot of alcohol. The last thing that she remembered was giving her keys to Defendant. Defendant did not remember exactly how many rounds they all drank but testified that he spent one hundred dollars that evening between paying the cover charge and buying alcohol. He did remember that they drank at least five rounds of shots of various hard liquors and that between the rounds he and Dustin drank beers while Victim drank mixed cocktails. Dustin recalled to law enforcement, "'I have never seen someone get so drunk so fast off three shots and a couple of beers [as Victim did].'"

{8} Defendant and Victim began kissing, and Dustin gave his keys to Defendant so that Defendant and Victim could go out to Dustin's truck. Defendant testified that he was not concerned about Victim's level of intoxication because "she was talking all right, . . . and she got down [the long, straight flight of stairs to the street level]

4

perfectly fine." According to Defendant, he and Victim engaged in a consensual sexual encounter in the back seat of Dustin's truck, including the use of Defendant's hands to penetrate Victim's vagina and anus at the same time. Defendant testified that Victim consented to all of the various sex acts, and the only reason they stopped was that Victim defecated.

{9} Defendant used Victim's shorts to clean her feces out of the back seat, and he threw the dirty shorts in a dumpster before calling Dustin to ask him to come outside. Dustin testified that "when [he] first saw that scene, [he thought] it look[ed] like a rape." Dustin was "freaked out" and discussed with Defendant "what [they] were going to do." They decided that Defendant would drive Victim's car to take her home and that Dustin would follow in his truck. Defendant "felt like it would be better if" he drove because, in his words, "I know that I can drive . . . intoxicated."

{10} Defendant testified that he and Victim talked as he drove and that she never mentioned feeling any pain or having any injuries. He further asserted that Victim began performing oral sex on him and "attempted to climb over the middle console and [mount him]" as he drove, but he "told her to stop" and "to sit down," which she did. Dustin and Defendant became separated on the drive, so they arranged by their cell phones to meet when they got to Belen. Both Dustin and Defendant parked the vehicles off the road to figure out what to do because they did not know where

5

Victim lived and did not want a passing police officer to investigate them for "drinking and driving." When Defendant asked Victim where she lived, she replied, "'I don't know.'" He also observed that "[s]he seemed more tired." Defendant asserted he was unconcerned about what the police might think of Victim's physical or mental state because "[he] wasn't aware of her medical state," despite admitting that Victim "was acting more and more drunk."

{11} Defendant and Dustin used Victim's cell phone to call Victim's father to come and get her and then moved Victim's car to a parking lot so that the car would be easier to find. They called her father again to give him the location of the car. When asked why Defendant left Victim alone before her father arrived, he stated that he "was afraid [of] . . . what [her father's] reaction would be when he drove up and seen his daughter intoxicated the way she was, . . . and then Dustin was kind of freaking out about it, too, he didn't want to be there."

{12} Victim's father found her sitting alone, unconscious, wearing just a top, in the passenger side of her car. There was "blood on the console, . . . her headrests, all over her seat," and blood covered her legs and "was running down . . . onto the floormat of the car." Victim's father called emergency services, who transported Victim to the hospital.

{13} At the hospital, the doctors noted that there was significant swelling throughout Victim's vagina, rectum, and anus. Her vagina was dilated "at least ten centimeters," a degree that does not naturally occur "[a]side from the delivery of a baby." The doctors opined that the dilation was caused by a "foreign object," approximately the diameter of the barrel of a "baseball bat" or a "balled-up fist." There was a "deep laceration," about ten centimeters long, "that extended from nearly the opening of the vagina . . . to . . . the very end of the vagina" near the cervix. After gynecological surgery, Victim's rectum required another specialist to repair a tear through "[a]ll the layers of the rectal wall" that ran ten centimeters up the rectum from her sphincter. Her injuries required multiple surgeries.

{14} After Dustin and Defendant left Victim, they drove home to Grants. Along the way, they stopped to eat at a twenty-four-hour diner where Defendant told Dustin that he "fisted" Victim and that he used his hand to penetrate her. Dustin "was scared" and "worried" that Defendant would get in trouble. He told Defendant "to save those text messages and everything [communicated between Defendant and Victim] because something is going to come up." The next day, Dustin "reminded [Defendant] that [Defendant] needed to go out and clean [the] truck." However, Defendant maintained that he was not concerned about Victim or getting into trouble, and he cleaned the truck only "[b]ecause it needed to be cleaned."

**B.      Charges and the Defense**

{15}    The State charged Defendant with multiple crimes, including the three counts on which he was convicted: two counts of criminal sexual penetration and one count of tampering with evidence.

{16}    Concerning Defendant's two convictions for criminal sexual penetration, Count 1 alleged that Defendant penetrated Victim's vagina by *force or coercion*, resulting in great bodily harm or great mental anguish; and Count 2 alleged that Defendant penetrated Victim's anus by *force or coercion*, resulting in great bodily harm or mental anguish. The jury was instructed to determine whether Defendant committed the crimes alleged in Count 1 and Count 2 based on two alternative theories of *force or coercion*. Specifically, the jury could find *force or coercion* if it determined that (1) he penetrated Victim when he knew or had reason to know that Victim was incapable of giving consent (Incapacity Theory) or (2) he penetrated Victim, who had the capacity to consent, when she did not consent (Express Non-Consent Theory). *See* § 30-9-10(A)(1), (4). Regarding Defendant's conviction for tampering with evidence, the jury was instructed that the State was required to prove that "Defendant destroyed, changed, or hid blood evidence by cleaning [the truck,] . . . intend[ing] to prevent the apprehension, prosecution, or conviction of himself for the crime of criminal sexual penetration."

{17} Defendant's trial strategy portrayed the events of the evening as the unfortunate result of "a couple of young kids who . . . drank too much, and . . . they engaged in . . . very unusual sexual activity." Defendant argued that the injuries to Victim were an accident but not a crime because Victim was conscious and consented to everything that occurred. Victim's level of intoxication, especially as to how it would have affected her conduct, awareness, perceptions, and capabilities, was highly contested. Experts opined on her level of intoxication, including whether it would have significantly affected her cognitive abilities, including her capacity to consent. One expert suggested that some persons could "seem lucid" and could "do things from driving vehicles, going out and emptying out their bank account[s], but still be in an alcohol blackout." Defendant also elicited lay witness testimony about Victim's tolerance to alcohol and expert testimony about how Victim's level of intoxication could affect her ability to perceive pain, arguing that this testimony undermined the expert opinion that Victim's injuries would have been so painful that they were "inconsistent with consensual intercourse." As the recitation of facts indicate, however, Defendant never claimed Victim was not intoxicated, only that she could somehow consent to such acts, and that she did.

{18} Based on his trial strategy, Defendant requested a mistake-of-fact instruction. The district court denied the requested mistake-of-fact instruction, concluding the

9

criminal sexual penetration instructions, the tampering with evidence instruction, and the accompanying unlawfulness instruction adequately instructed the jury concerning Defendant's purported mistake of fact. The jury found Defendant guilty of both counts of first-degree criminal sexual penetration and one count of tampering with evidence. For those crimes, the district court sentenced Defendant to thirty-six years in prison. In a split decision, the Court of Appeals concluded that Defendant had been "entitled to the mistake of fact instruction" concerning each crime and therefore reversed all three convictions. *Apodaca*, 2021-NMCA-001, ¶¶ 32-33, 36, 40. The relevant portion of the minority's dissent concluded that there was not sufficient evidence to grant Defendant a mistake-of-fact instruction. *Id.* ¶ 60 (Vanzi, J., concurring in part and dissenting in part). The dissent would have also affirmed the district court's denial of the instruction on tampering with evidence. *Id.* ¶ 66. We granted the State's petition for certiorari review.

**II.     ANALYSIS**

{19}     The State claims that the Court of Appeals erred when it determined that Defendant was entitled to mistake-of-fact instructions, on both counts of criminal sexual penetration and the count of tampering with evidence, and argues that the jury instructions were adequate.

10

{20}     Defendant asks this Court to affirm the Court of Appeals and argues that the jury should have been instructed to find him not guilty of criminal sexual penetration if it found "that he honestly and reasonably believed [Victim] was capable of and consented to the sexual activity." He also argues the Court of Appeals correctly determined he was entitled to a mistake-of-fact instruction that provided the jury could only convict Defendant of tampering with evidence if it *first* found him guilty of criminal sexual penetration and *then* found that he cleaned the truck seat to avoid being found guilty of criminal sexual penetration. In Defendant's view, the district court's errors require the reversal of all his convictions. We consider the arguments related to the criminal sexual penetration convictions, and then turn to the arguments related to the tampering with evidence conviction.

**A.     Standard of Review**

{21}     "The propriety of jury instructions given or denied is a mixed question of law and fact." *State v. Salazar*, 1997-NMSC-044, ¶ 49, 123 N.M. 778, 945 P.2d 996. We review de novo whether a reasonable view of the evidence could support a requested, and rejected, instruction. *State v. Gaitan*, 2002-NMSC-007, ¶¶ 10-11, 131 N.M. 758, 42 P.3d 1207. If we determine that there is a reasonable view of the evidence that supports giving a requested instruction, a defendant is entitled to the instruction. *Id.* ¶ 11. Only if we determine that the district court erred, by refusing to give the

11

requested instruction, do we proceed to the ultimate question, whether the error amounted to reversible or fundamental error. *See State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134 (stating the two applicable standards of review when a defendant challenges jury instructions on appeal: reversible error and fundamental error). Ordinarily, a defendant is only entitled to a requested mistake-of-fact instruction if the defendant's "ignorance or mistake of fact . . . negates the existence of a mental state essential to the crime charged." *Reese v. State*, 1987-NMSC-079, ¶ 17, 106 N.M. 498, 745 P.2d 1146 (Ransom, J., specially concurring). In this case, because we determine that the district court did not err when it declined to give the requested mistake-of-fact instruction, we do not reach the question of whether the alleged error would constitute reversible or fundamental error.

**B.      Defendant Was Not Entitled to the Requested Instruction Related to His Criminal Sexual Penetration Convictions**

{22}      "Criminal sexual penetration is the unlawful and intentional causing . . . of penetration, to any extent and with any object, of the genital or anal openings of another, whether or not there is any emission." Section 30-9-11(A). Defendant faced two counts of criminal sexual penetration "by the use of force or coercion that results in great bodily harm or great mental anguish to the [V]ictim." Section 30-9-11(D)(2). Defendant admitted that he intentionally penetrated Victim's vagina and anus with his hands. However, he argued that the conduct was lawful because Victim

12

consented to those acts; in other words, he did not "use . . . force or coercion." *See id.*

{23} The Court of Appeals majority and dissenting opinions suggested that the analysis should focus on whether Victim consented to the graphic "physical force" used that caused the injuries to victim. *See Apodaca*, 2021-NMCA-001, ¶ 31 (stating that the jury had to determine whether Victim "consent[ed] to the use of physical force or physical violence"); *id.* ¶ 61 (Vanzi, J., concurring in part and dissenting in part) (same). We disagree with this approach. Although the amount of physical force used to accomplish the penetration may be relevant circumstantial evidence, the amount of physical force is not direct evidence that resolves whether Victim willingly agreed, or consented, to being penetrated.

{24} Whether a person consents to being penetrated is the touchstone of the analysis, not whether the person agrees to the use of any specific measure of physical force. In this case, the jury was required to determine whether Victim consented to having her vagina and anus penetrated by Defendant's hands. If Victim did not willingly agree—did not consent—to the penetration, Defendant committed first-degree criminal sexual penetration by "force or coercion." *See* § 30-9-11(A), (D)(2); UJI 14-132.

{25} "[F]orce or coercion" occurs when the jury finds the existence of any one of

13

five, alternative conducts or circumstances. *See* § 30-9-10(A)(1)-(5). Simply put, all the alternatives of *force or coercion* correlate to a lack of consent, not to the nature or amount of physical force used to accomplish the penetration. The State prosecuted Defendant under two of those five alternatives. We have described these two as the Incapacity Theory and the Express Non-Consent Theory.

{26}    Under the State's Incapacity Theory, the penetration was unlawful because Defendant "[knew] or ha[d] reason to know that [V]ictim [was] unconscious, asleep or otherwise physically helpless or suffer[ed] from a mental condition that render[ed] [V]ictim incapable of understanding the nature or consequences of the act." Section 30-9-10(A)(4). Considering the State's Incapacity Theory—if the predicate circumstances existed—the victim was not capable of consenting as a matter of law. Under such a circumstance, actual consent is irrelevant, even if the victim's conduct appeared to manifest consent.

{27}    Under the State's Express Non-Consent Theory, the penetration was unlawful because Defendant "use[d] . . . physical force or physical violence" to penetrate Victim. Section 30-9-10(A)(1). In other words, Victim had the capacity to consent but did not consent. Considering the Express Non-Consent Theory, actual consent is at issue, but capacity is not. The crucial error in Defendant's argument and the Court

of Appeals majority is the merging of the State's two theories without a proper understanding of the distinguishing factors.

**1.  The jury instructions**

{28}  The jury was given a single instruction for each count of first-degree criminal sexual penetration that encompassed two theories as alternatives based on UJI 14-961 NMRA, which allows alternative theories to be advanced in a single instruction. *See id.* Use Note 1 ("This instruction sets forth the elements of . . . three types of 'force or coercion' in Section 30-9-10(A) . . . : (1) use of physical force or physical violence; (2) threats; (3) mental or other incapacity of the victim. If the evidence supports two or more of these theories of 'force or coercion,' this instruction may be used.").

{29}  Defendant requested two instructions related to his defense that Victim's consent negated his criminal liability: an instruction on unlawfulness and an instruction on mistake of fact. The district court gave the jury Defendant's requested unlawfulness instruction:

> For the act [of first-degree criminal sexual penetration] to have been unlawful it must have been done without consent and with the intent to arouse or gratify sexual desire or to intrude upon the bodily integrity or personal safety of [Victim].
>
> Criminal sexual penetration causing great bodily harm . . . does not include a penetration . . . for purposes of consensual activity.

15

{30} Defendant's requested instruction on mistake of fact read:

> Evidence has been presented that [Defendant] believed that [Victim] consented to the sexual activity that occurred, her injuries were accidental and she was not seriously injured. The burden is on the state to prove beyond a reasonable doubt that [D]efendant did not act under an honest and reasonable belief in the existence of those facts. If you have a reasonable doubt as to whether [D]efendant's actions resulted from a mistaken belief of those facts, you must find [D]efendant not guilty [of all charges].

The district court did not give the jury Defendant's requested mistake-of-fact instruction, concluding that the unlawfulness instruction sufficiently covered the consent defense.

{31} Defendant, however, believes that he was entitled to the same mistake-of-fact instruction concerning both counts of criminal sexual penetration *and* both the Incapacity Theory and the Express Non-Consent Theory. *See Apodaca*, 2021-NMCA-001, ¶¶ 30-32. This argument ignores the differences between the two alternative theories of *force or coercion*, each of which required Defendant to have possessed a different "essential" mental state which, therefore, cannot be negated by the same mistake of fact. *See Reese*, 1987-NMSC-079, ¶ 17 (Ransom, J., specially concurring) (stating that a defense by mistake of fact must "negate[] . . . a mental state essential to the crime charged"). Our analysis considers the relevant distinction ignored by the Court of Appeals majority.

## 2.       The Court of Appeals

{32}    In a split decision, the Court of Appeals determined that Defendant was entitled to the mistake-of-fact instruction. *Apodaca*, 2021-NMCA-001, ¶¶ 36, 40. The majority held that "Defendant's mistaken belief would negate the intent necessary to convict Defendant for using physical force or physical violence to penetrate a person who did not have the capacity to consent." *Id.* ¶ 33. The Court concluded that Defendant was entitled to a mistake-of-fact instruction regarding first-degree criminal sexual penetration under the State's Express Non-Consent Theory but that he was not entitled to a mistake-of-fact instruction under the State's Incapacity Theory. *Id.* ¶¶ 36-37. The Court further concluded that Defendant was entitled to a mistake-of-fact instruction as to tampering with evidence because Defendant's "honest and reasonable belief that Victim had the capacity to consent and did consent to his actions" would negate the mens rea for tampering with evidence. *Id.* ¶ 40.

{33}    This opinion takes a different analytical posture than the Court of Appeals' opinion. The Court of Appeals centered its analysis on what it viewed to be the core issue in this case: whether there was sufficient evidence that Defendant believed Victim was capable of and did consent to acts that led to the first-degree criminal sexual penetration charges; and whether Defendant was entitled to a mistake-of-fact

17

defense as to either charge. *See id.* ¶¶ 36, 40; *id.* ¶ 63 (Vanzi, J., concurring in part and dissenting in part) (same).

{34} We recognize that Defendant did not cross-appeal whether he was entitled to a mistake-of-fact instruction concerning the State's Incapacity Theory, which required proof that he knew or had reason to know of Victim's incapacity. However, we first discuss the Court of Appeals determination that Defendant was not entitled to a mistake-of-fact instruction concerning that theory because it highlights the different mental states required by each theory. We then turn to the main issue on appeal: whether Defendant was entitled to a mistake-of-fact instruction on Victim's capacity to consent under the State's Express Non-Consent Theory. Because that theory did not require proof of Victim's legal capacity to consent or Defendant's knowledge or awareness of Victim's capacity, we conclude that a mistake-of-fact instruction on that issue was not required.

**3. Defendant was not entitled to a mistake-of-fact instruction under the State's Incapacity Theory**

{35} We agree with the Court of Appeals that Defendant was not entitled to a mistake-of-fact instruction on the State's Incapacity Theory; that is, that Victim was not capable of consenting to the sexual acts and that "Defendant knew or had reason to know of Victim's incapacity." *Apodaca*, 2021-NMCA-001, ¶ 37. The jury was

18

"adequately instructed upon the matter by other instructions." *State v. Venegas*, 1981-NMSC-047, ¶ 9, 96 N.M. 61, 628 P.2d 306 (citation omitted).

{36} The jury was instructed, consistent with Section 30-9-10(A)(4), that it could convict if the State proved beyond a reasonable doubt that Victim "was . . . suffering from a mental condition so as to be incapable of understanding the nature or consequences of what [D]efendant was doing[] and [that D]efendant knew or had reason to know of the condition of [Victim]." This instruction encapsulated Defendant's argued mistake of fact, that he did not know, and could not have known, that Victim was too intoxicated to consent. The jury was therefore adequately instructed on Defendant's identified mistake of fact—whether Defendant knew or should have known of Victim's incapacity to consent. A separate mistake-of-fact instruction concerning a defendant's knowledge of a victim's level of intoxication is not required where the instructions given require "finding that the defendant knew, or reasonably should have known, that the victim was unable to resist due to [the victim's] intoxication." 65 Am. Jur. 2d *Rape* § 80 (2011); *see also State v. Sosa*, 2009-NMSC-056, ¶¶ 3, 40, 42, 147 N.M. 351, 223 P.3d 348 (affirming a defendant's conviction for criminal sexual penetration where there was sufficient evidence to support the jury's finding that the defendant "knew or had reason to know the victim" was too intoxicated to give consent). We now turn to whether Defendant

19

was entitled to a mistake-of-fact instruction under the State's Express Non-Consent Theory.

**4.     Defendant was not entitled to a mistake-of-fact instruction under the State's Express Non-Consent Theory**

{37}     The physical force or physical violence alternative of *force or coercion* does not require the State to prove that a significant amount of strength or exertion was used to perpetrate the sexual penetration; *force or coercion* simply means that the victim did not consent. *See* § 30-9-10(A) ("Physical or verbal resistance of the victim is not an element of force or coercion."). Thus, "the question is not whether the victim protested or physically resisted but rather whether the defendant was aware of, and consciously disregarded, a substantial and unjustifiable possibility that [the penetration] was being conducted without [the victim's] consent." 65 Am. Jur. 2d *Rape* § 5 (2011). "[T]he essence of consent is that it is given out of free will." *Id.*

{38}     It would be absurd to consider whether Victim actually consented if Victim lacked the legal capacity to consent, and we will not construe the law in a manner that leads to an absurd result. *Cf. State v. Montano*, 2020-NMSC-009, ¶ 13, 468 P.3d 838 (observing that this Court will not construe statutes in a manner that leads to absurdity); *see also* NMSA 1978, § 12-2A-18(A)(3) (1997). Consequently, the Express Non-Consent Theory *presumes* that a victim had the legal capacity to consent. The only question remaining is one of fact: whether the victim actually

20

consented. That is, when the jury considered Victim's capacity to consent, it was necessarily considering only the State's Incapacity Theory.

{39} Nevertheless, the Court of Appeals majority and dissent endorsed this absurdity and construed New Mexico law to tolerate it. The majority determined that Defendant was entitled to a mistake-of-fact instruction on Victim's capacity when the material element at issue was whether Victim actually consented, not Defendant's subjective understanding of Victim's capacity. *Apodaca*, 2021-NMCA-001, ¶¶ 31, 36-37; *id.* ¶ 61 (Vanzi, J., concurring in part and dissenting in part) (quoting paragraph 31 of the majority opinion). In so doing, the Court of Appeals conflated the two exclusive, alternative theories of *force or coercion. See id.* ¶ 30. We analyze Defendant's trial and appellate strategies here to more thoroughly explain why the Court of Appeals erred.

{40} Defendant's trial strategy attempted to establish both that Victim had the capacity to consent and that she actually consented. Defendant testified to having used the degree of physical strength or exertion necessary to commit the crime of first-degree criminal sexual penetration. *See* § 30-9-11(A), (D)(2) (requiring, for first-degree criminal sexual penetration, the "intentional . . . penetration . . . of [Victim's] genital or anal openings . . . by . . . force or coercion that results in great bodily harm . . . to [Victim]"). Thus, the contested issue was consent. This trial

21

strategy is confirmed by defense counsel's closing argument that "whatever [Victim] remembers or doesn't remember, it didn't happen the way she says it happened. . . . [S]he[ was] not unconscious," and by counsel's representation that Defendant "testified that [Victim] was a fully conscious and consenting participant in the sexual encounter." Where a defendant claims the victim consented and the victim denies there was consent, "the jury must weigh the evidence and decide which of the two witnesses is telling the truth." 65 Am. Jur. 2d *Rape* § 84 (2011).

{41} Here, Defendant claims Victim consented; Victim did not remember but asserted that she would not have consented to having her vagina or anus penetrated by someone's hand. If the jury credited Defendant's testimony, the jury was required to acquit. Instead, the jury convicted Defendant of both counts of criminal sexual penetration. If the jury convicted under the State's Incapacity Theory, it necessarily determined that Victim lacked the legal capacity to consent and that Defendant knew or had reason to know of that incapacity. *See* Section II(B)(1), paragraphs 26-27, *supra*. If the jury convicted under the State's Express Non-Consent Theory, it necessarily determined that Victim had the capacity to consent and did not consent, and that Defendant was not telling the truth.

{42} Confronted with the failure of his trial strategy, Defendant adjusted his tactics on appeal. Defendant argued that when the jury considered the State's Express Non-

Consent Theory—whether Defendant used physical force or physical violence to penetrate Victim against her will—the jury also should have been instructed to consider the State's Incapacity Theory—whether Defendant mistakenly, but reasonably and subjectively, believed Victim consented because he was unaware of Victim's incapacity. And as we previously explained, the jury was adequately instructed on that theory—that Defendant knew or had reason to know of Victim's incapacity. *See* Section II(B)(1), paragraphs 26-27, *supra*. In sum, since the Express Non-Consent Theory presumed that Victim had the legal capacity to consent, Defendant's awareness of Victim's incapacity was not material to that theory.

## C. Defendant Was Not Entitled to a Mistake-of-Fact Instruction Concerning His Tampering with Evidence Count

{43} The Court of Appeals also determined that Defendant was entitled to a mistake-of-fact instruction concerning his tampering with evidence conviction. *Apodaca*, 2021-NMCA-001, ¶ 40. Defendant urges this Court to affirm this determination and argues that if he did not believe he was committing a crime when he sexually penetrated Victim, he could not have formed the specific intent required to commit tampering with evidence by his removal of Victim's blood from the truck seat. We disagree. Defendant did not identify evidence for a mistake of fact that

23

could have negated the specific intent required by the tampering with evidence statute.

{44} "Tampering with evidence consists of destroying, changing, hiding, placing or fabricating any physical evidence with intent to prevent the apprehension, prosecution or conviction of any person or to throw suspicion of the commission of a crime upon another." NMSA 1978, § 30-22-5(A) (2003). "[I]ntentional conduct which, by its nature, aims to prevent identification of an underlying offense or to obstruct an investigation" is sufficient for conviction. *State v. Jackson*, 2010-NMSC-032, ¶ 14, 148 N.M. 452, 237 P.3d 754, *overruled on other grounds by State v. Radosevich*, 2018-NMSC-028, ¶ 2, 419 P.3d 176. "[T]he proper focus should be on the accused's subjective, specific intent *to blind or mislead law enforcement*." *Id.* ¶ 16 (emphasis added). In fact, a defendant may be convicted of tampering with evidence even if the defendant has "destroyed the evidence that could have proved the exact nature and level of [the defendant's] crime[]" so that "an underlying crime could not be successfully prosecuted." *Radosevich*, 2018-NMSC-028, ¶¶ 28-29.

{45} The specific intent required—to hamper an investigation or mislead law enforcement—is not negated by a subjective belief that, ultimately, no crime was committed. "[T]he intent requirements of the tampering statute can be met regardless of whether a crime has in fact been committed." *Jackson*, 2010-NMSC-032, ¶ 14

(internal quotation marks and citation omitted). Even if Defendant subjectively believed that Victim consented and that he ultimately committed no crime, his belief would not negate the intent element of the crime in this case.

{46} The jury was instructed that to convict Defendant of tampering with evidence, the State had to prove that Defendant "intended to prevent the apprehension, prosecution, or conviction of himself for the crime of sexual penetration" when he cleaned the truck and "destroyed, changed, or hid blood evidence." This instruction does not require Defendant to have believed he was guilty of criminal sexual penetration at the time he cleaned the truck. The Court of Appeals failed to appreciate that Defendant could have formed the essential intent—to mislead law enforcement and thereby thwart being apprehended or prosecuted for a crime—while at the same time could have resolutely believed he did not commit that crime. *See Jackson*, 2010-NMSC-032, ¶ 14.

{47} Defendant admitted that he left before Victim's father arrived because he "was afraid [of] . . . what [the father's] reaction would be when he drove up and seen his daughter intoxicated the way she was, . . . and then Dustin was kind of freaking out about it, too, he didn't want to be there." On the night of the crimes when Defendant told Dustin that he used his hand to penetrate Victim, Dustin "was scared" and "worried," telling Defendant "to save those text messages and everything

25

[communicated between Defendant and Victim] because something is going to come up." When Defendant cleaned the truck on the next day, there can be no doubt that Defendant was aware of the possibility that he would be investigated.

{48} Although Defendant testified that he cleaned the truck only "[b]ecause it needed to be cleaned," the jury was not required to credit his testimony. *See State v. Cabezuela*, 2011-NMSC-041, ¶ 45, 150 N.M. 654, 265 P.3d 705 ("[T]he jury is free to reject [the d]efendant's version of the facts." (internal quotation marks and citation omitted)). Considering the evidence, the jury could have inferred that Defendant specifically intended "to disrupt [a] police investigation" when he cleaned the back seat of Dustin's truck out of concern that there would be an investigation and that he could be questioned, arrested, and charged regardless of whether he believed he committed criminal sexual penetration. *State v. Garcia*, 2011-NMSC-003, ¶ 13, 149 N.M. 185, 246 P.3d 1057 (internal quotation marks and citation omitted); *accord State v. Telles*, 2019-NMCA-039, ¶ 21, 446 P.3d 1194 ("Intent to tamper with evidence can be inferred from circumstantial evidence."). Since Defendant identified no evidence for a mistake of fact that could actually negate the required intent, the district court did not err by refusing to give the requested instruction concerning the tampering with evidence count.

## III.  CONCLUSION

{49}  Based on the foregoing, we reverse the Court of Appeals and affirm all of Defendant's convictions.

{50}  **IT IS SO ORDERED.**

_____

**DAVID K. THOMSON, Chief Justice**

**WE CONCUR:**

_____

**MICHAEL E. VIGIL, Justice**

_____

**C. SHANNON BACON, Justice**

_____

**JULIE J. VARGAS, Justice**